EXHIBIT 1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| Harold Stanley Jackson,<br><br>                                      *Plaintiff*,<br><br>            v.<br><br>Starbucks Corporation,<br><br>   and<br><br>Dan White-Hunt<br>Residence unknown,<br><br>                                   *Defendants*. | Case No: 1:19-cv-01487 (RC)<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Harold Stanley Jackson submits this First Amended Complaint against Defendant Starbucks Corporation and Defendant Dan White-Hunt, and alleges and seeks relief as follows:

**Introduction**

1. On April 24, 2018, Plaintiff Harold Stanley Jackson, an African-American man wearing a dark winter coat with the hood up, suffered a humiliating and physically dangerous experience at the Starbucks located at 2130 H Street NW. Shortly after entering the store, Mr. Jackson picked up two retail items he planned to purchase, held them in plain view, and began walking towards the end of the line (and away from the exit). A Starbucks employee, however, told him that he was "not supposed to touch" items for sale, which Mr. Jackson perceived as being unfair treatment that sparked a conversation with the manager, Defendant Dan White-Hunt.

2. A few seconds after Mr. Jackson left his conversation with White-Hunt to stand in the back of the line, Starbucks employee-barista Richard Washington stalked out threateningly from behind the counter to approach Mr. Jackson, and then pushed him. As a result of this assault, Mr. Jackson fell and suffered a seizure, and was taken away to a nearby hospital on a stretcher.

3. This is not the first time Starbucks has been accused of discriminating against patrons on the basis of their race or physical appearance. Two weeks earlier, in an incident that happened to be caught on cell phone video, employees at a Starbucks in Philadelphia called the police on two black men who were merely sitting inside waiting for a business associate to arrive. That incident sparked a national outrage, prompted Starbucks to publicly announce—ten days before Mr. Jackson's assault—that its treatment of these two black men was "reprehensible," and that it "clearly ha[d] more work to do" around its treatment of persons of color in its stores. Starbucks was not wrong.

4. This incident is in many ways more serious than the incident in Philadelphia, as it ended with Mr. Jackson being taken to the hospital on a stretcher. But since it happened to occur in a small area of the store not covered by security cameras, and since the incident was not caught on anyone's cell phone, it begs the question: "How does Starbucks treat its black and brown customers when the cameras are off?"

5. Mr. Jackson now seeks compensation for the economic and non-economic injuries that he suffered because of this misconduct by Starbucks and its employees.

## Parties

6. Plaintiff Harold Stanley Jackson is an individual who resides in the District of Columbia at 3220 Connecticut Avenue NW, Apt. 2; Washington, DC 20008-2510.

7. Defendant Starbucks Corporation is a corporation organized and existing under the laws of the State of Washington. Since 1992, Starbucks has been registered to do business in the District of Columbia and has regularly done and solicited business in the District of Columbia. Its headquarters is located at 2401 Utah Avenue S; Seattle, WA 98134. On information and belief, Starbucks owns and operates the store in which Mr. Jackson was injured.

8. Defendant Dan White-Hunt is the Starbucks manager who was on duty on April 24, 2018 at 2130 H Street NW in Washington, DC.

## Jurisdiction and Venue

9. This Court has jurisdiction over Plaintiffs' claims under D.C. Code § 11-921.

10. Personal jurisdiction is proper under D.C. Code § 423(a). Each of the Defendants, directly or through an agent, caused tortious injury in the District of Columbia by acts or omissions in the District of Columbia.

11. Venue is proper in the District of Columbia because Plaintiff's injuries arose and continue in the District of Columbia.

## Factual Background

**A. Starbucks Employees in Philadelphia Call 911 on Two Innocent Black Men (April 12, 2018)**

12. On April 12, 2018, Starbucks employees at a Philadelphia Starbucks called 911 against two black men who were sitting inside waiting for a business associate to arrive.

Starbucks had refused to allow the men to use the bathroom, saying it was for "paying customers only."

13. The incident was caught on video, posted online, and went viral on the internet, stirring outrage and protests over whether this was a case of racial profiling.

14. On April 14, 2018, Starbucks publicly acknowledged that its treatment of these two black men was "reprehensible," and that it "clearly ha[d] more work to do" around its treatment of persons of color in its stores.

**B. Starbucks Employee Richard Washington Assaults Mr. Jackson (April 24, 2018)**

15. Less than two weeks after the Philadelphia incident, on April 24, 2018, Mr. Jackson and his fiancé stopped at the Starbucks located at 2130 H Street NW in Washington, DC.

16. Mr. Jackson went inside. His fiancé was talking to someone on the phone and waited outside.

17. Mr. Jackson walked into the store at 12:08 pm, wearing a black wool hat and a large black jacket with the hood up. Below is a still image from Starbucks surveillance video showing Mr. Jackson walking into the store.



18. Upon entering the store, Mr. Jackson walked up to the counter, picked up a bag

of dipped madeleines, and then started to walk in toward back of the line—away from the exit and further into the store.

19. As Mr. Jackson walked towards the back of the line holding the dipped madeleines in plain view in his hands, the Starbucks employee at the register said something like, "Sir, you're not supposed to touch those," or "Sir, you have to pay for those."

20. Mr. Jackson replied to the effect of, "What, do you think I'm going to steal it?"

21. When the employee continued to insist that he return the item to the shelf, Mr. Jackson asked to speak to a manager.

22. The following are still images from Starbucks surveillance videos showing Mr. Jackson pick up the items, walk back towards the end of the line (further into the store and away from the exit), and then pause to turn towards the person behind the register:






23. Approximately two minutes later, Mr. Jackson began speaking with Manager Dan White-Hunt near the display cases. The conversation continued for a little less than two minutes, and then Mr. Jackson walked to the back of the line.

24. The following still image from Starbucks surveillance videos shows Mr. Jackson and White-Hunt as they spoke, at the far left of the image.



25. The back of the line was near the front entrance of the store, but happened to be in an area just outside of the viewing range of Starbucks' surveillance cameras.

26. A few seconds after Mr. Jackson reached the end of the line, Washington—a large and physically imposing man—came out behind the counter and walked aggressively towards Mr. Jackson. On information and belief, he did so on White-Hunt's instruction or with his encouragement. See the following still image.



27. Seconds later, White-Hunt followed Washington. See image below.



28. As Washington and White-Hunt confronted Mr. Jackson—in a gap in the surveillance cameras' coverage—Mr. Washington moved White-Hunt out of the way

7

said something to the effect of, "he gotta get out," and then pushed Mr. Jackson. Mr. Jackson replied, "Big man, don't put your hands on me no more." Washington pushed Mr. Jackson again, causing Mr. Jackson to fall, briefly lose consciousness, and apparently, to suffer a seizure.

29. Below are still images showing what appear to be customers' reactions to the battery, which occurred approximately ten seconds after White-Hunt walked out to confront Mr. Jackson.



30. Washington quickly returned behind the counter. Less than a minute had elapsed between the time Washington began stalking towards Mr. Jackson, and the time he returned behind the counter.

31. When Mr. Jackson woke up, he heard his fiancé screaming, "Who touched him?" Another person advised him to be still.

8

C. **University Police and Emergency Medical Services Arrive, Take Statements, and Take Mr. Jackson to the Hospital on a Stretcher 15 Minutes Later**

32. While Mr. Jackson was lying on the floor at Starbucks, someone called the George Washington Police, who arrived approximately five minutes after Washington had pushed Mr. Jackson to the ground.

33. White-Hunt spoke to a police officer for a couple of minutes inside the store, and then continued the conversation outside. See below.



34. Shortly thereafter, emergency medical personnel arrived on the scene, and treated Mr. Jackson for approximately ten minutes before wheeling Mr. Jackson to the nearby hospital on a stretcher. See image below.

9



35. As a result of the incident, Mr. Jackson was hospitalized for several hours.

**D. White-Hunt Submits a Demonstrably False Incident Report (April 24, 2018)**

36. Shortly after Mr. Jackson's assault, White-Hunt called a Starbucks reporting line to file an oral incident report of what happened:

> Police were not called. . . .
>
> Nobody was injured . . . .
>
> [R]oughly around 12:15pm, a customer came into the store and stood in front of the line. The customer was told by the barista at the register that he needed to be in line in order to be assisted. The customer started to get irritated and demanded to speak with a manager. SM Dan came out to assist and the customer shouted at the SM using profanity words. SM attempted to calm the customer down and went into the backroom to collect a business card. 45 seconds later, the SM over heard the customer yell at the front end barista, Chelsie, that he was going to mess her up and yelled at her with profanity language. At that time, another barista, Richard, approached the customer and advised the customer to leave the premises. Customer got more aggravated and proceeded to attack Richard. In defense, Richard held the customer back until the campus

10

police arrived and took the customer off the premises. . . .

**E. Mr. Jackson Sends a Letter Informing Starbucks that His Treatment was "Likely the Result of a Company-Wide Practice of Discrimination." (May 1, 2018)**

37. On May 1, 2018, Mr. Jackson's counsel sent a letter to Starbucks for hand delivery to the manager at the Starbucks store at 2130 H Street NW.

38. The letter described the incident, asserted his belief that the assault was intentional and "likely the result of a company-wide practice of discrimination," and asked Starbucks to "preserve all records, including documents and surveillance footage, which may be relevant to the action."

39. Starbucks never responded to the letter, and does not appear to have conducted any kind of investigation into the allegations.

**F. Starbucks Closes Its Stores and Conducts Nationwide Training on Racial Bias; Starbucks Now Purports to be Aware of How Biases Manifest in Public Spaces (May 29, 2018)**

40. On May 29, 2018, Starbucks closed all of its stores to conduct nationwide training on racial bias.

41. At the time it conducted its racial bias training, Starbucks claimed it was "waking up" to the discriminatory treatment of customers in its stores in May 2018.

42. To understand how to prevent discrimination—including discrimination based upon race and physical appearance—it is important to understand how bias works, and its role in our society.

43. Race and racism have been around for centuries and as a microcosm of society, Starbucks is not immune from racist behavior towards its customers.

44. In fact, prejudice in public accommodations is deeply rooted in America.

45. Black people navigate public spaces differently than white people.

46. Implicit biases—i.e., the brain's automatic, instantaneous association of stereotypes and attitudes with particular groups of people in a way that is often contrary to our personal values—are based on socially constructed stereotypes.

47. The media frequently associates violence, criminality, and poverty with people who are black.

48. Since the mid-twentieth century, social scientists have uncovered empirical evidence of negative attitudes toward African Americans as well as stereotypes about their being violent and criminal. Those biases persist today, as measured by not only explicit but also implicit instruments.

49. Internalized oppression and racism are insidious forces that cause marginalized groups to turn on themselves, often without even realizing it.

50. The combined effect of internalized oppression and internalized racism is often devastating—it can reinforce self-fulfilling negative stereotypes, resulting in self-destructive behavior.

51. A person of color can discriminate against another person of color.

52. Because internalized racism is a systemic oppression, it must be distinguished from human wounds like self-hatred or "low self-esteem" to which all people are vulnerable.

53. It is important to understand systemic racism as systemic because that makes clear that it is not a problem simply of individuals. It is structural.

54. Thus, even people of color who have "high self-esteem" must wrestle with the

internalized racism that infects us, our loved ones, our institutions, and our communities.

55. This last point is a crucial reminder that as individuals pursue their work, they must be mindful that dominant narratives affect communities internally as well as externally.

56. Starbucks employees have treated customers in a discriminatory manner based on their race, for example, moving the tip jar when black men enter the store.

57. Starbucks employees have also treated customers in a discriminatory manner based on their personal appearance, for example, confronting a customer dressed in "dirty sweatpants" for stealing only to learn that the customer was shopping for a gift, or accusing a "scruffy" unshaven customer of panhandling only to learn that the man was speaking to his own wife.

58. To Starbucks' credit, it shared several admissions of discriminatory treatment by its employees (on information and belief, these incidents occurred before or near the time of April 24, 2018) as part of its response to the April 12, 2018 incident in Philadelphia. Some of those stories are available here: https://stories.starbucks.com/stories/2018/thethirdplace/.

### G. Mr. Jackson Experiences Ongoing Injuries, Pain, and Suffering

59. Over the days and weeks following the incident described above, Mr. Jackson suffered severe pain in his neck and back and needed to wear a brace.

60. To this day, he continues to suffer neck and back pain caused by Starbucks employee Washington in April 2018.

61. As a result of his injuries, Mr. Jackson has incurred medical expenses relating to their diagnosis and treatment.

62. The physical pain from his injuries have prevented him from exercising as he used to, made it difficult for him to sleep, and limited his major life activities, such as cleaning up his apartment, and these limitations have caused substantial mental anguish and frustration.

63. Finally, Mr. Jackson was humiliated because Starbucks, a public accommodation, treated him unequally because of his race and physical appearance.

## Count I: Negligence

64. Plaintiff incorporates the allegations set forth in the preceding paragraphs above as if fully set forth here.

65. Starbucks owes a duty of reasonable care to customers in its retail stores.

66. Washington failed to exercise reasonable care by coming out from behind the counter, stalking towards Mr. Jackson in a threatening manner, escalating the situation through physical proximity and threatening demeanor, and twice pushing Mr. Jackson.

67. White-Hunt failed to exercise reasonable care by failing to prevent Washington from coming out from behind the counter, stalking towards Mr. Jackson in a threatening manner, escalating the situation through physical proximity and threatening demeanor, and twice pushing Mr. Jackson.

68. White-Hunt negligently supervised Washington. He knew or should have known that Washington was behaving in a dangerous or otherwise incompetent manner, and armed with that actual or constructive knowledge, failed to adequately

supervise him.

69. Starbucks is vicariously liable for Washington's and White-Hunt's actions, which were (a) within the scope of their employment, (b) motivated at least in part by a desire to serve the employer, and (c) a foreseeable consequence of the hostile situation created for Mr. Jackson on account of his race and physical appearance.

70. As a direct and proximate result of Defendants' acts and omissions described above, Mr. Jackson has suffered and will continue to suffer substantial economic and non-economic harm, including (a) lost income, (b) medical expenses, (c) physical pain, and (d) mental anguish.

### Count II: Battery

71. Plaintiff incorporates the allegations set forth in the preceding paragraphs above as if fully set forth here.

72. Washington intentionally pushed Mr. Jackson, causing a harmful and offensive bodily contact.

73. White-Hunt is vicariously liable for Washington's actions via aiding-and-abetting liability: he knowingly and substantially aided Washington in committing the acts and omissions described in this count, generally aware of his role as part of an overall tortious activity at the time that he provided assistance.

74. Starbucks is vicariously liable for its employees' actions, which were (a) within the scope of their employment, (b) motivated at least in part by a desire to serve their employer, and (c) a foreseeable consequence of the hostile situation created for Mr. Jackson on account of his race.

75. As a direct and proximate result of Defendants' acts and omissions described above, Mr. Jackson has suffered and will continue to suffer substantial economic and non-economic harm, including (a) medical expenses, (b) physical pain, and (c) mental anguish, including humiliation and embarrassment.

### Count III: D.C. Human Rights Act, D.C. Code § 2-1402.31

76. Plaintiff incorporates the allegations set forth in the preceding paragraphs above as if fully set forth here.

77. Mr. Jackson is African American, and thus a member of a protected racial group.

78. At the time of the incident, Mr. Jackson appeared physically in a manner that some might interpret as being indigent, homeless, or otherwise belonging to a protected group of vulnerable people in our society. (See images.)

79. Defendant Starbucks intentionally discriminated against Mr. Jackson, wholly or partially, on account of his race and/or physical appearance, by (a) telling Mr. Jackson that he could not pick up and hold a retail item while waiting in line or otherwise implying that he intended to steal a retail item; (b) physically threatening Mr. Jackson in a manner that escalated the situation; and (c) having an employee push him.

80. Starbucks is vicariously liable for its employees' actions, which were (a) within the scope of their employment, (b) motivated at least in part by a desire to serve their employer, and (c) a foreseeable consequence of the hostile situation created for Mr. Jackson on account of his race.

81. This discrimination occurred in a Starbucks retail store, a public

accommodation under the D.C. Human Rights Act.

82. Defendant's conduct, and the conduct of its employees within the scope of their employment, denied Mr. Jackson the full enjoyment of Starbucks's goods, services, facilities, privileges, advantages, and accommodations.

83. As a direct and proximate result of Defendants' acts and omissions described above, Mr. Jackson has suffered and will continue to suffer substantial economic and non-economic harm, including (a) medical expenses, (b) physical pain, and (c) mental anguish, including humiliation and embarrassment.

### Count III: 42 U.S.C. § 1981

84. Plaintiff incorporates the allegations set forth in the preceding paragraphs above as if fully set forth here.

85. Mr. Jackson is African American, and thus a member of a protected racial group.

86. Defendant Starbucks intentionally discriminated against Mr. Jackson on account of his race, by (a) telling Mr. Jackson that he could not pick up and hold a retail item while waiting in line or otherwise implying that he intended to steal a retail item; (b) physically threatening Mr. Jackson in a manner that escalated the situation; and (c) having an employee push him.

87. Starbucks is vicariously liable for Washington's actions, which were (a) within the scope of employment, (b) motivated at least in part by a desire to serve the employer, and (c) a foreseeable consequence of the hostile situation created for Mr. Jackson on account of his race.

88. Defendant's conduct, and the conduct of its employees within the scope of their employment, denied Mr. Jackson the (a) full right to make and enforce contracts as is enjoyed by white citizens, and (b) enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

89. As a direct and proximate result of Defendants' acts and omissions described above, Mr. Jackson has suffered and will continue to suffer substantial economic and non-economic harm, including (a) medical expenses, (b) physical pain, and (c) mental anguish, including humiliation and embarrassment.

## Prayer for Relief

Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief, jointly and severally against each Defendant:

a. An award of at least $300,000 for past and future damages, including medical expenses, economic damages, and damages for physical pain and mental anguish, including humiliation and embarrassment;

b. An award of prejudgment interest on all liquidated sums;

c. An award of attorney's fees and costs; and

d. Additional relief as the Court deems just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all issues so triable.

March 6, 2020                                    Respectfully submitted,

/s/ Timothy R. Clinton
Timothy R. Clinton (D.C. Bar No. 497901)
Gregory M. Lipper (D.C. Bar No. 494882)
CLINTON & PEED
777 6th Street, 11th Floor
Washington, DC 20001
(202) 996-0919
tim@clintonpeed.com
glipper@clintonpeed.com

*Counsel for Plaintiff*