HAROLD STANLEY JACKSON,

*Plaintiff,*

v.

STARBUCKS CORPORATION, et al.,

*Defendants.*

Case No: 1:19-cv-01487 (RC)

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Harold Stanley Jackson submits this opposition to Defendants' Motion for Summary Judgment.

## INTRODUCTION

Based on the testimony, documents, and video footage amassed during discovery, a reasonable jury could conclude as follows: Harold Jackson, a 5'7", 154-pound Black man, was racially profiled and assaulted by Starbucks employees, acting with the authorization and approval of the Starbucks manager. When Jackson entered the store, Starbucks employees perceived his clothing as "grungy." He then picked out two bags of baked goods and headed towards the back of the line to pay for them. Although he was doing something that the store's white customers regularly do without incident, the cashier falsely accused Jackson of stealing. After he spoke briefly to the manager, Jackson was approached and twice pushed by a 6'6", 300-pound Starbucks employee—who was trailed by the manager and acting according to policies established by the manager and with the manager's approval. The assault caused Jackson to fall and suffer a seizure, for which emergency medical assistance was required. When Jackson's white fiancée came into the store distraught, Starbucks employees expressed surprise that she—a

white woman—had agreed to date him. EMTs rushed Jackson to the hospital on a stretcher, where he was admitted immediately for trauma. Neither the manager nor the store's employees had been trained about discrimination or racial bias; and the store manager—who, like Starbucks, insists that Starbucks is immune to racial prejudice—sometimes made racist comments, including referring to the store's Black employees as "lazy," "savage," and "ghetto."

In response, Jackson has sued Starbucks for discriminating against him on the basis of race and personal appearance, and for acting negligently. If the jury finds the facts described above, then Jackson will inevitably prevail. In nonetheless seeking to deny Jackson the chance to present this case at trial, Starbucks asks the Court to adopt its version of the events, accept its inferences, and believe (some of the testimony from some of) its witnesses.

Starbucks should know better. Summary judgment is not the time to assess the credibility of witnesses or resolve their conflicting accounts. In any event, many of the facts described above are corroborated by video footage, written documents, and even the testimony of Starbucks' own employees, including its manager. At trial, Starbucks will be free to argue to the jury that its store employees are free of racial bias; that a white, well-dressed customer would have been treated just as poorly; and that Starbucks met the standard of care when the store manager allowed a 300-pound employee to shove and hospitalize a customer half his weight. But that decision must be made by a jury of Jackson's peers, selected from the community in which he lives and the Starbucks store operates, and drawing on their own experiences in deciding what happened and who to believe.

# BACKGROUND

After being racially profiled, falsely accused of stealing, and assaulted at the Gelman Library Starbucks, Jackson seeks to redress violations 42 U.S.C. § 1981, the D.C. Human Rights Act, and duties under common-law torts.

## A. Starbucks policies and incidents related to racial discrimination.

Starbucks is a ubiquitous chain of coffee shops, with stores located around the country. On April 12, 2018, Starbucks employees called 911 on two Black customers at a Starbucks in Philadelphia because they were allegedly "staying in [the] store without making a purchase." *See* Ex. 10 (Starbucks 2971) Ex. 11 (Starbucks 2953). The incident produced a national outcry over racial profiling at Starbucks stores. *See Starbucks CEO Calls Arrest of Two Black Men at Philadelphia Store "Reprehensible,"* CNN (Apr. 15, 2018), https://tinyurl.com/4b68tuuh.

In response, Starbucks CEO Kevin Johnson described the incident in an email to all Starbucks employees. Ex. 10 (Starbucks 2971). According to Johnson, the Black Starbucks customers suffered "discrimination or racial profiling." *Id.* Starbucks's "practices and training led to a bad outcome—the basis for the call to the Philadelphia police department was wrong," and "this should never escalated as it did." *Id.* .

Starbucks, of course, has many stores in the District of Columbia as well. One of the busiest District-area Starbucks stores is located at George Washington University's Gelman Library (and is open to the public). Hudnall Tr. 78:12–16. The employees of this store are "primarily black" (Ward Tr. 226:16–17), and shift overseer Charlene Ward is Black as well (*id.* at 226:8–19). The store manager is a white man, Dan White-Hunt. *Id.* And White-Hunt reports to another white man, District Manager Ryan Hudnall. Hudnall Tr. 24:5–25:19.

As store manager, White-Hunt "set[] the culture" and was responsible for ensuring that "everybody feels welcome, seen and heard." White-Hunt Tr. 45:6–14. He also was expected to "oversee, support and execut[e]" racial-bias training of the primarily Black staff he manages. *Id.* at 30:16–32:16. At least one employee, however, believed White-Hunt "had implicit bias." Ward Tr. 96:16–20. Indeed, White-Hunt would describe certain Black employees as "lazy." *Id.* at 96:18–97:16. And even when speaking with Ward, a Black woman, White-Hunt would refer to Black employees as "'savage,' meaning an uncivilized person," or "ratchet" or "ghetto." Ward Tr. 96:5–98–99:7.

Needless to say, store manager White-Hunt had received no "training from Starbucks relating to discrimination or bias." White-Hunt Tr. 158:18–159:1. Nor could he recall the "Starbucks policy with regards to discrimination or bias." *Id.* at 159:2–5. As of April 2018, he had never "trained [his] employees about how to avoid treating people with discrimination or bias." White-Hunt Tr. 318:8–11. And he never had talked to his employees about "common stereotypes of people of different races and how to avoid acting out on those stereotypes." *Id.* at 318:15–19. Despite the lack of training or discussion, White-Hunt just "knew that it would never happen." *Id.* at 318:12–14.

Even now, White-Hunt denies that "prejudice in public accommodations is deeply rooted in America." White-Hunt Tr. 172:3–6. He thinks that "Starbucks is immune from racist behavior towards its customers." *Id.* at 171:13–16. And he has never heard the phrase "implicit bias." White-Hunt Tr. 172:7–21. White-Hunt's beliefs are consistent with Starbucks's formal litigation position in this case. *See* ECF No. 33 ¶ 43 (denying that Starbucks is "not immune from racist behavior towards its customers); *id.* ¶ 44 (denying that "[p]rejudice in public accommodations is

deeply rooted in America"); *id.* ¶ 46 (stating that Starbucks "lacks sufficient information to admit or deny" the common definition of implicit bias).

### B. When he visits the Gelman Library Starbucks, Jackson is falsely accused of stealing food and then pushed to the ground by Starbucks personnel.

Less than two weeks after Black customers were racially profiled at Starbucks in Philadelphia, Harold Jackson, a Black man, visited the Starbucks at Gelman Library.

At the time, Jackson had just recently found housing after living in a shelter, so his "clothes situation wasn't all that great at the time." Jackson Tr. 225:5–227:9. According to Jackson, "I probably had on some jeans probably was too big for me and, you know, the shirt probably was wrinkled or whatever that be. I wasn't dressed up to my best potential." *Id.* at 225:9–14. The shift overseer, Ward, observed that his clothes were the color of "washed-too-many-times black." Ward Tr. 135:14–136:10. And she thought that Jackson "looked a little beat up or grungy." *Id.* at 221:7–22. She added, "Mr. Jackson has a look, like he's a drug user or that he abuses drugs. He has that look. I don't think he had any teeth in his mouth, and if he did, he didn't have the top ones." *Id.* at 225:1–4.

In addition, Ward and her colleagues "were surprised" that Jackson was socializing with a white woman (his fiancée). *Id.* at 221:7–22. "I didn't want to stereotype or show any type of judgment," Ward said, but "she's a white lady . . . [who] looked all right, and he was a black man, and he looked a little beat up or grungy, and they were together." *Id.*

After he entered the Starbucks, Jackson walked to the counter, picked up two bags of dipped madeleines, and then went to the back of the checkout line, located away from the exit. *See generally* Starbucks Exs. 4–5 (surveillance video). The video shows Jackson acting normally. He calmly walks to the register, picks up the madeleines with his left hand, and places the bag in

full view in his right hand, which also is holding a coffee cup; he stands for a moment and browses the food selection, picks up a second item, and holds that in full view as well; then he walks to the back of the line—away from the exit. Starbucks Ex. 5. at 12:08:44–12:08:54. He does not place the items in his pockets, and he does not head for the door. *Id.* For Starbucks customers, this type of behavior was neither uncommon nor discouraged. Ward Tr. 22:20–23:9.

But Robinson, who operated the cash register, started yelling at him. Jackson Tr. 260:11–18. She ordered Jackson to return the item to the shelf, using "a loud voice as though she made everybody stop and look" (*id.* at 196:19–197:4), causing Jackson to wonder, "'Why she talking to me like that?'" (*id.* at 199:19–200:3). Robinson then told Jackson something "like, 'You know you can't take that from here, right?'" *Id.* at 212:15–213:8. She addressed him like he "was a child or something. Her voice, her manner, her tone which you speak to somebody in"—it "was a bad thing." *Id.* at 261:7–20. And she gave Jackson "the impression that she was looking down on" him. *Id.* at 267:12–21. After admonishing Jackson, moreover, Robinson clapped her hands and appeared visibly agitated towards him. Starbucks Ex. 5 at 12:11:00–12:12:40.

White customers at Gelman Library Starbucks were not treated this way. During several other visits, Jackson had seen "[p]lenty of Caucasian peoples do [what he did] plenty of times." Jackson Tr. 209:4–14. "And nothing was said to them." *Id.* at 209:4–14.

**C. With the apparent authorization and approval of the Starbucks manager, a Starbucks employee assaults Jackson.**

After Robinson publicly and falsely accused him of stealing, Jackson asked to speak to the manager, telling her: "Excuse me. I'm not going to argue with you, Miss, but I would like to see your manager," and Robinson went to get the manager. Jackson Tr. 213:9–12. Although Jackson was "behaving like . . . a customer trying to talk to the manager to get some respect in the store,"

he was "non-threatening" and not yelling. *Id.* at 244:17–245:1, 245:14–17. He acted like he was "embarrassed more than anything," because he "just felt like I was less than everybody." *Id.* at 241:16–242:7. The surveillance video corroborates Jackson's version of events and contradicts the more dramatic accusations made by White-Hunt and Ward. *See* Starbucks Ex. 5 at 12:08–12:14.

A few minutes later, manager Dan White-Hunt spoke to Mr. Jackson near the display case. *Id.* After their two-minute conversation, Jackson returned to the back of the checkout line. *Id.* at 12:11:00–12:12:40. He waited in line, again in a non-threatening manner. Jackson Tr. 245:14–17.

Five seconds later, Jackson was approached by Starbucks employee Richard Washington, who was followed by manager Dan White-Hunt. Starbucks Ex. 5 at 12:12:45–12:13:39; White-Hunt Tr. 216:3–11. Washington stood 6′6″ tall and weighed 300 pounds; Jackson was 5′7″ and weighed 154 pounds. Jackson Tr. 245:18–246:9; Ex. 17 at Jackson 6 (4/24/18 hospital records).

Starbucks's written training materials tell employees that if a customer is "disruptive," the employee should "approach the customer" and may "physically confront that person." Ex. 16 (Starbucks 2900); White-Hunt Tr. 152:2–153:19. Although the manager "would ideally be the best person to do so," other employees—even baristas—may physically confront customers if "they feel uncomfortable." White-Hunt Tr. 152:14–153:11. In fact, at the Gelman Library Starbucks, the duty of physical-confrontation typically fell to subordinates, because White-Hunt was "a manager that avoided confrontation" and would "ignore or not handle conflict situations." Ward Tr. 40:4–17.

When he approached Jackson, the towering Washington wanted "to basically make [Jackson] walk out. Kind of get him out the way. Move him out . . . ." Ward Tr. 175:3–176:2. So Washington pushed Jackson and told him to "'Get out'." Jackson Tr. 245:18–246:9. Jackson protested, "'don't put your hands on me no more,'" hoping that "the manager would step in between." *Id.* 246:6–14. White-Hunt "believed that removing Mr. Washington from the situation would make the situation safer" (*id.* at 283:17–284:3) but did not tell Washington to stop assaulting Jackson—so Washington pushed Jackson again (Jackson Tr. 246:6–14).

After Washington pushed him for the second time, Jackson fell back, hit the floor, and "was motionless for a while." Ward Tr. 189:7–11. Indeed, Ward thought that Jackson "passed out or he might have hit his head." *Id.* at 185:2–187:13. Even after Jackson was immobile and possibly unconscious from a head injury, Starbucks's employees wanted him "out of the store so [they] could continue transactions." *Id.* 187:20–189:4. "We can't make no money when a customer is laying on the floor." *Id.* Based upon her personal observations of White-Hunt and the other employees at the store, Ward concluded that the behaviors leading Starbucks to mistreat Jackson "could have been corrected before this maybe came the time." *Id.* at 44:14–22. Unfortunately, "management failed to act on it beforehand."

**D. EMTs administer medical treatment in the store and then transport him to the hospital on a stretcher.**

Jackson's fiancée came into the store shortly afterwards and found him "on the floor laying with his head hitting against the wall." Workman Tr. 21:16–22:1. He appeared to be having "some type of seizure." *Id.* at 45:12–20. She "got down on the ground and lifted [Mr. Jackson's] head to put it on [her] lap because no one was helping." *Id.* at 22:7–9.

George Washington University Hospital's Emergency Medical Response Group was notified at 12:18 pm, and they arrived on the scene a few minutes later. Ex. 19, 3. Upon their arrival, Jackson "appeared to be unconscious." *Id.* The emergency medical technicians administered oxygen, which improved his response. *Id.* at 1, 3. Although they detected "no obvious signs of trauma," he did exhibit signs of a stroke: he was "unable to keep his left arm up and [unable] to repeat the sentence 'You can't teach an old dog new tricks.'" *Id. See also id.* at 3 (noting signs of stroke under both the Cincinnati Stroke and FAST Stroke scales). The emergency medical technicians notified the hospital at 12:40 pm of a "Stroke Alert" and a "Trauma Alert," because "the patient was assaulted and was unconscious." *Id.* at 1. They took him to George Washington University Hospital on a stretcher; upon his arrival, "[d]octors quickly assessed" Jackson, "deemed him a Trauma White," and he was "brought directly to the trauma bay." *Id.* at 3.

### E. White-Hunt submits a materially false incident report.

At 3:00pm that day, White-Hunt sent an email to his direct supervisor, Ryan Hudnall, about the incident. White-Hunt Tr. Ex. 9. In it, he admitted that Washington "pushed" Jackson "or grabbed him and let go to which he proceeded to fall backwards and knock down a moving fixture cube," after which "GWU police and EMT came over to assist." *Id.* But when he submitted his formal incident report Starbucks's reporting line 11 minutes later, his story was false in two material respects. White-Hunt Tr. Ex. 6. First, he falsely stated that "[n]obody was injured" and it made no reference to emergency medical assistance. White-Hunt Tr. Ex. 6 at Starbucks 218; *cf.* White-Hunt Tr. 225:5–11 (equating "hurt" with "need[ing] medical attention" or "medical assistance"). Second, he falsely stated that Washington merely "held the customer back until the campus police arrived and took the customer off the premises." *Id.*

**F. After the Philadelphia and Gelman Library incidents, White-Hunt facilitates a cursory racial-bias training for Gelman Library employees.**

A month later, and six weeks after the racial profiling in Philadelphia, Starbucks closed its stores to conduct nationwide training on racial bias. White-Hunt Tr. 165:7–166:12. The resulting training lasted "no more than two hours." Ward Tr. 89:13–15. The training did not lead Starbucks to change any policies; "[i]t was more visual for customers." White-Hunt Tr. 169:2–171:10.

The training featured a video, which White-Hunt ordered the staff "not to discuss." Ward Tr. 92:4–18. If customers asked why Starbucks had closed, employees should give "an answer that is soothing to people to hear because at the time Starbucks was being viewed negatively because of the Philadelphia incident." *Id.* According to Ward, the training was unhelpful and simply made many of the Black employees uncomfortable: "the tone of the room changed when the video was going on." *Id.* at 94:19–95:3. Afterwards, Ward and the other Black employees decided not to discuss it with anyone "internally among the partners." *Id.* at 94:19–95:3.

## ARGUMENT

Starbucks carries a heavy burden on its motion for summary judgment, which may be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "fact is 'material' if it is capable of affecting the substantive outcome of the litigation," and a "dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Ctr. for Law & Just. v. U.S. Dep't of State*, 289 F. Supp. 3d 81, 85–86 (D.D.C. 2018).

In its motion, Starbucks ignores the basic rule that factual disputes must be resolved in favor of Jackson, the nonmovant—the question is what reasonable jurors could find, not what Starbucks hopes they find. As dictated by blackletter law, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment hence must be denied when material facts are disputed, and even when undisputed facts are reasonably susceptible to multiple inferences. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).

Perhaps most importantly—and dooming Starbucks' motion—"[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* . Likewise, whether a plaintiff's testimony is uncorroborated is immaterial: "Corroboration goes to credibility, a question for the jury, not the district court." *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016). If the case turns on "a credibility contest," courts "cannot resolve the dispute at the summary judgment stage against the non-moving party." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013).

## I. Jackson's claims for race discrimination under Section 1981 and race and personal appearance discrimination under DCHRA raise triable issues of fact.

This Court has already held that Jackson can state a discrimination under Section 1981 and the DCHRA if he proves the facts alleged in his amended complaint: "Jackson was told that he had to pay for the dipped madeleine cookies he wished to purchase, and that he could not hold the item while he waited in line, and shortly thereafter was told that he had to leave the store—and was then physically injured when he did not immediately leave. If anything, the request to leave accompanied by a use of force—potentially made on White-Hunt's behest—makes an inference of discriminatory intent all the more salient here compared to the facts as plead in

*Bonner.*" *Jackson v. Starbucks Corp.*, Civil Action No. 19-1487 (RC), 2021 U.S. Dist. LEXIS 68207, at *27 (D.D.C. Apr. 8, 2021) (citing *Bonner v. S-Fer Int'l*, 207 F. Supp. 3d 19, 24 (D.D.C. 2016)) (record references omitted).

After the benefit of discovery, Jackson has obtained admissible evidence—described below—that proves everything the Court already found to be sufficient to make out a claim, and much more besides. Nevertheless, Starbucks lobs a three-paragraph argument at the end of its brief that the discrimination claims cannot survive summary judgment because: (1) the alleged bad actors "are also black," and (2) "there is no evidence in the record that either Ms. Robinson or Mr. Washington made comments derogatory of Mr. Jackson's race or personal appearance." Mot. 15–16. Starbucks's argument ignores both the law and the undisputed facts.

## A. Jackson states a claim for race discrimination under Section 1981.

Under 42 U.S.C. § 1981, people of color have "the same right . . . to make and enforce contracts, . . . and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." In bringing this claim—that he was racially profiled and then assaulted at a popular coffeehouse—Jackson seeks to "remove the impediment of discrimination from [his] ability to participate fully and equally in the marketplace." *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 150 (1989)).

"Where discriminatory intent and disparate treatment are at issue, courts should be cautious in granting summary judgment, because questions of intent and disparate treatment are difficult questions of fact often left to the jury." *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 39 (D.D.C. 2003) (citing *Johnson v. Securiguard, Inc.,* No. Civ. A. 98–2381, 2000 WL 862643, at *3 (D.D.C.2000)). This court has held that an "inference of unlawful discrimination" may be

rationally drawn if the plaintiff was "'[a] deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or . . . [b] received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.'" *Bonner*, 207 F. Supp. 3d at 24 (D.D.C. 2016) (quoting *Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 707 (D. Md. 2000)). Such evidence would establish a prima facie case, at which point the burden would shift to the defendant "to articulate a nondiscriminatory reason for its actions." *Banks v. Plaintiff, Bank of Am., N.A.*, 505 F. Supp. 2d 159, 168 (D.D.C. 2007). If the defendant articulates a nondiscriminatory reason, the plaintiff then has the burden "to raise a triable issue of fact regarding whether that reason is pretextual for discrimination." *Id.* .

### 1. *The facts support a prima facia case of discrimination.*

Jackson generally accuses Starbucks of three escalating acts of mistreatment: (1) rudely implying he was stealing; (2) asking him to leave when he protested that discriminatory mistreatment; and (3) shoving him twice, causing him to fall to the ground and requiring his evacuation by ambulance to the hospital. Individually and collectively, these allegations state a prima facie case of discrimination under either test.

When Jackson picked up a retail item in the store, Robinson yelled at Jackson in a manner perceived as an accusation of theft. Jackson Tr. 260:11–18. She used "a loud voice as though she made everybody stop and look" (*id.* at 196:19–197:4), causing him to think, "'Why she talking to me like that?'" *Id.* 199:19–200:3. She then said something "like, 'You know you can't take that from here, right?'" and "her voice, her tone in which she spoke," was perceived as "offensive" (*id.* at 212:15–213:8). Afterwards, while Jackson was waiting in line in a non-threatening manner (*id.* 245:14–17), Washington—who was 6'6" and approximately 300 pounds (White-Hunt Tr.

216:3–11)—approached Jackson—who was half his size at 5'7" and 154 pounds (Ex. 17)—"to basically make him walk out. Kind of get him out the way. Move him out . . ." (Ward Tr. 175:3–176:2). Washington pushed him saying, "'Get out'" (Jackson Tr. 245:18–246:9). Jackson protested, "'don't put your hands on me no more,' . . . thinking at that point the manager would step in between," but then Washington pushed him a second time. *Id.* 246:6–14. According to Starbucks's shift overseer Charlene Ward, Jackson then fell back and hit the floor, causing her to believe Jackson "passed out or he might have hit his head." Ward Tr. 185:2–187:13. *See also id.* at 189:7–11 ("Jackson fell and was motionless for a while").

This sequence of events far exceeds what this Court has held is sufficient "to support an inference of racially discriminatory intent." *Jackson*, 2021 U.S. Dist. LEXIS 68207, at *26–27. It is enough if a plaintiff was "'flippantly' asked if she was aware of an item's high price tag and then 'rudely' asked if she was prepared to make a purchase, after which an employee 'demand[ed]' that she leave the store." *Id.* (citing *Bonner*, 207 F. Supp. 3d at 23).[1] But here, the rude treatment and demand that Jackson leave was "accompanied by a use of force," which "makes an inference of discriminatory intent all the more salient here compared to the facts as plead in *Bonner*." *Id.*

Starbucks's reliance on testimony from Starbucks employees Ward and White-Hunt does not allow it to ignore Jackson's sworn version of events. *Cf.* Starbucks SOF ¶¶ 18–19 (citing deposition testimony of Ward and White-Hunt). If the case turns on "a credibility contest,"

---

[1] Jackson also testified that he personally observed similarly situated white patrons who were treated differently. On several other visits to Starbucks, he had seen "[p]lenty of Caucasian peoples do [what he did] plenty of times. . . . And nothing was said to them. And I see when I did it, it was something said to me." *Id.* at 209:4–14. And the shift supervisor on duty that day testified that this is not uncommon behavior by Starbucks customers. Ward Tr. 22:20–23:9.

courts "cannot resolve the dispute at the summary judgment stage against the non-moving party." *Ayissi-Etoh*, 712 F.3d 576. (And if it did turn on credibility, the Court would have no good reason to believe White-Hunt. For example, nearly two months before White-Hunt's testimony about the Washington-Jackson interaction on which Starbucks now relies, White-Hunt swore that he did not see any of it: Jackson was already on the floor by the time White-Hunt came out of his office. White-Hunt Tr. 254:20–256:5.)

> 2. *Starbucks's motion does not directly assert non-discriminatory reasons for Jackson's mistreatment; but if it had, those reasons would depend upon disputed facts.*

Having succeeded in establishing a *prima facie* case, Starbucks has the burden "to articulate a nondiscriminatory reason for its actions." *Banks*, 505 F. Supp. 2d at 168. If they succeed in articulating such a reason, Jackson must "raise a triable issue of fact regarding whether that reason is pretextual for discrimination." *Id.* Starbucks's three-paragraph throwaway argument about the two discrimination claims does not address the legal framework at all, let alone articulate legitimate non-discriminatory reasons for its actions. Nevertheless, to the extent reasons might be inferred from elsewhere in Starbucks's brief, we address them out of an abundance of caution.

> a. <u>Starbucks offers no reason for rudely accusing Jackson of stealing.</u>

Starbucks has offered no evidence—not even admissible testimony from Robinson herself—to support a non-discriminatory reason for rudely accusing Jackson of theft. Nothing in the video provides objective indicia of criminality that might justify his rude mistreatment. Starbucks Ex. 5. at 12:08:44–12:08:54. He does not walk surreptitiously; he does not attempt to hide what he is doing; he does not place an item in his pockets; he does not head for the door. *Id.* And Starbucks's shift supervisor Charlene Ward testified that this kind of behavior by customers

was not uncommon or discouraged. Ward Tr. 22:23:9. Accordingly, Jackson's complaint about Robinson's mistreatment—even standing alone—survives.

> ### b. Starbucks claims it asked Jackson to leave the store because he was "belligerent," but Jackson swears he was respectful.

Starbucks does, however, imply that Washington had a non-discriminatory reason for asking Jackson to leave the store: he "became belligerent," he "was shouting," and he "made various verbal threats to Ms. Robinson." Mot. 4–5 (citing SOF ¶¶ 14–15). Such behavior can be a legitimate non-discriminatory reason to remove someone from a store. *Apollo v. Bank of Am., N.A.*, No. 17-cv-2492 (APM), 2019 U.S. Dist. LEXIS 191391, at *1–2 (D.D.C. Nov. 5, 2019).

But this theory would require the Court to find that no jury could credit Jackson's contrary testimony, and thus is not appropriate on summary judgment. *Moore*, 571 F.3d at 66 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

While Starbucks's employees claim that Jackson acted inappropriately, Starbucks SOF ¶¶ 14–15 (citing Ward Tr. 21:8–17, 23:10–20, 34:15–35:6; White-Hunt Tr. 250:9–251:11), Jackson denies it.[2] He responded to Robinson's rudeness with, "Excuse me. I'm not going to argue with you, Miss, but I would like to see your manager." Jackson Tr. 213:9–12). He was behaving "in a non-threatening way." Jackson Tr. 245:14–17. His demeanor at the time was "embarrassed more than anything," because he "just felt like I was less than everybody." Jackson Tr. 241:16–242:7.

---

[2] Its Statement of Facts also cites a July 2019 email from Robinson to Starbucks's lawyers, SOF ¶ 14, but this is "sheer hearsay," and "counts for nothing on summary judgment." *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (internal quotation marks omitted).

The surveillance video—which Starbucks attached as Exhibit 5 to its motion—corroborates Jackson's version of events and contradicts that of White-Hunt and Ward. Ex. 5 at 12:08–12:14).

Thus, unlike in *Apollo*, where the court dismissed a discrimination claim because the plaintiff had "not disputed Defendants' factual assertions" about his "rude and verbally abusive" behavior, 2019 U.S. Dist. LEXIS 191391, at *2, summary judgment is inappropriate here because it presents—at worst—"a classic 'he said, she said' . . . situation," where resolution "depends on credibility determinations." *Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 215 (D.D.C. 2010).

    c.    <u>Starbucks claims that Washington is protected by an unpleaded affirmative defense of self-defense, but that—at most—is a question for the jury.</u>

Starbucks also implies that Washington shoved Jackson "in self-defense." Mot. 14 (citing Ex. 1 ¶ 22 & Ex. C). But Starbucks did not plead self-defense in its answer, so any such defense is waived. *Kroot v. District of Columbia*, 800 F. Supp. 976, 980 (1992) (citing Fed. R. Civ. P. 8(c)).[3]

Amending their pleadings to assert the defense now would be futile: It would require Starbucks to establish that Jackson presented an actual or apparent, unlawful and immediate threat; that Washington "honestly and reasonably believed that harm was imminent," and that Washington's "response was necessary to save himself from the danger." *Rude v. Adeboyeku*, 552 F. Supp. 2d 32, 35 (D.D.C. 2008) (citing *Brown v. United States*, 619 A.2d 1180, 1182 (D.C. 1992); *McPhaul v. United States*, 452 A.2d 371, 373 (D.C. 1982)) (citations omitted). In addition, the defense would not be available if Washington "provoke[d] a fight." *Harris v. United States*, 364

---

[3] Starbucks also does not raise it in the context of the battery claim. *See* Mot. 13–14 (arguing only that Starbucks cannot be vicariously liable for intentional torts).

F.2d 701, 702 (D.C. Cir. 1966) (citing *Rowe v. United States*, 164 U.S. 546 (1896)). And without any admissible evidence from Washington, Starbucks would not be able to establish what Washington actually believed.

In any event, summary judgment also would be inappropriate because there are legitimate fact questions about other aspects of the defense, including: whether Jackson was threatening at all; whether Jackson ever pushed Washington at all; if so, who pushed first; and if Jackson pushed first, whether Washington provoked it.

Starbucks cannot rely on Washington's out-of-court statement (Ex. 1 ¶ 17 & Ex. C) on summary judgment. *Greer*, 505 F.3d at 1315. Nor can Starbucks ask the Court to ignore Jackson's testimony in favor of Ward—who admitted that she "really [doesn't] know how it happened" (Ward Tr. 38:7–10)—or White-Hunt—who first claimed he missed the whole interaction (White-Hunt Tr. 254:20–256:5). By contrast, Jackson swears he was not threatening anyone (*id.* 245:14–17) when Jackson pushed him saying, "'Get out'" (Jackson Tr. 245:18–246:9). Jackson protested, "'don't put your hands on me no more,' . . . thinking at that point the manager would step in between," but then Washington pushed him a second time. *Id.* 246:6–14. Self-defense, this is not.

In addition, fact that Washington was literally twice as large as Jackson—White-Hunt Tr. 216:3–11 (6'6", 300 pounds); Ex. 6 at Jackson 6 (5'7", 154 pounds)—eviscerates any claim that pushing Jackson would have been reasonable or proportional under almost any set of circumstances. Even White-Hunt conceded that Washington made the situation unsafe, not Jackson: he "believed that removing Mr. Washington from the situation would make the situation safer." White-Hunt Tr. 283:17–284:3.

A jury could certainly conclude that Washington initiated the physical contact; and that even if Jackson pushed first, Washington (a) provoked a fight by physically confronting Jackson "like security" (Ward Tr. 167:16–18) and giving him "nowhere to go; nowhere to run" (*id.* at 37:9–18); (b) that Washington could not reasonably have believed that harm was imminent from this man half his size who was on the "elderly, weak side" (Ward Tr. 38:11–12); and (c) that Washington's response was more than necessary to save himself from the danger.

3. *Other evidence supports a general culture of discrimination at Starbucks.*

The evidence cited above is more than sufficient to permit a jury to find that the defendants acted with discriminatory intent against Jackson when they accused him of theft, tried to usher him out of the store "like security," and shoved him to the ground. But the record is replete with much more evidence establishing a culture of discrimination at Starbucks, from which one can infer discriminatory intent against Jackson.

The workers at the Gelman Library Starbucks were "primarily black" (Ward Tr. 226:16–17), including shift overseer Charlene Ward (black) (*id.* 226:8–19), but the store is run by Dan White-Hunt (white) (*id.*), who reported to District Manager Ryan Hudnall (white) (Hudnall Tr. 24:5–25:19). It was White-Hunt's job to "set[] the culture" and "[e]nsur[e] that everybody feels welcome, seen and heard." White-Hunt Tr. 45:6–14. And yet, prior to May 2018, White-Hunt had received no "training from Starbucks relating to discrimination or bias," and he could not recall the "Starbucks policy with regards to discrimination or bias." White-Hunt Tr. 158:18–159:5.[4] That lack of training is apparent: White-Hunt still denies that "prejudice in public

---

[4] Ward confirmed that she did not recall any "training at all at Starbucks about . . . race or race discrimination" prior to May 2018. Ward Tr. 86:21–87:22.

accommodations is deeply rooted in America" (White-Hunt Tr. 172:3–6), believes that "Starbucks is immune from racist behavior towards its customers," (White-Hunt Tr. 171:13–16), and has never—even by 2021—heard of the term "implicit bias" ( *id.* at 172:7–21). And at the time of Jackson's assault, White-Hunt had never "trained [his] employees about how to avoid treating people with discrimination or bias" (White-Hunt Tr. 318:8–11), and he had never "discussed with [his] employees . . . common stereotypes of people of different races and how to avoid acting out on those stereotypes" (*id.* at 318:15–19). And yet, Starbucks selected him to "oversee, support and execut[e]" all of the training for the primarily black employees in the store he manages. White-Hunt Tr. 30:16–32:16. The lack of training is apparent: White-Hunt frequently spoke with his second-in-command, calling some of the Black employees "lazy," and referring to them as "'savage,' meaning an uncivilized person," or "ratchet" or "ghetto." Ward Tr. 96:5–98–99:7.

But White-Hunt's use of racially derogatory terms did not happen in a vacuum—they are well-placed within Starbucks's broader culture of discrimination. Ten days before Starbucks racially profiled and assaulted Jackson, its CEO sent an email to all Starbucks employees to discuss a situation in a Starbucks in Philadelphia in which two black men were arrested. Ex. 10. According to Starbucks's CEO, the incident involved "discrimination or racial profiling" and he admitted that they were the product of Starbucks's "practices and training." *Id.* And as the Court has already acknowledged, this Philadelphia incident "further strengthens the inference that Jackson was intentionally discriminated against here." *Jackson*, 2021 U.S. Dist. LEXIS 68207, at *27.

Nor can Starbucks rely on the racial bias it provided in May 2018 in the wake of the public outcry over Philadelphia. White-Hunt Tr. 165:7–166:12. The resulting training lasted "no more than two hours," Ward Tr. 89:13–15, and it did not lead Starbucks to change any policies; "[i]t was more visual for customers." White-Hunt Tr. 169:2–171:10. The training featured a video, which White-Hunt ordered the staff "not to discuss." Ward Tr. 92:4–18. If customers asked why Starbucks had closed, employees should give "an answer that is soothing to people to hear because at the time Starbucks was being viewed negatively because of the Philadelphia incident." *Id*. According to Ward, the training was unhelpful and simply made many of the Black employees uncomfortable: "the tone of the room changed when the video was going on." *Id*. at 94:19–95:3. Afterwards, Ward and the other Black employees decided not to discuss it with anyone "internally among the partners." *Id*. at 94:19–95:3.

4. *Shift supervisor Charlene Ward expressed direct, actual bias against Jackson that she claimed she shared with other Starbucks employees.*

And there is direct evidence that Starbucks employees held racially biased attitudes towards Jackson personally. Ward admitted that she and her colleagues "were surprised" that Jackson was socializing with a white woman (his fiancée). *Id*. at 221:7–22. "I didn't want to stereotype or show any type of judgment," Ward said, but "she's a white lady . . . [who] looked all right, and he was a black man, and he looked a little beat up or grungy, and they were together." *Id*. "This kind of evidence itself may be a potential manifestation of race discrimination, even when a person expresses such sentiments towards a member of her same race." *Banks*, 505 F. Supp. 2d at 168 n.12 (black employee said black customer "did not 'look' like a business owner").

\* \* \*

In short, Jackson now has sworn testimony to back up everything the Court found sufficient to state a claim at the pleading stage, plus mountains more. These facts are much more than mere "speculative belief," as Starbucks claims in its motion (at 16), and surely permit a jury to find that Jackson's treatment resulted from discrimination.

## B.  Jackson states a claim for race and personal-appearance discrimination under the DCHRA.

The DCHRA makes it unlawful in the District to "deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" either "wholly or partially" on the basis of, *inter alia*, "race, color, [or] personal appearance." D.C. Code § 2-1402.31(a)(1).

Because "[t]he legal standards applicable to race discrimination are the same under the DCHRA and [Section] 1981," *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (quoting *Fox v. Giaccia*, 424 F. Supp. 2d 1, 6–7 (D.D.C. 2006)), the Court need not conduct the same analysis twice. Consequently, Jackson's DCHRA intentional racial discrimination claim also survives summary judgment for the same reasons articulated above.

As for Jackson's claims that Starbucks mistreated him because of his personal appearance, the record more than supports this conclusion. Jackson's general physical appearance requires no speculation, because he appears on video next to other Starbucks customers and patrons. Ex. 5. A jury could certainly conclude from the video alone that Jackson's physical appearance was different, and perhaps not as "put together," as the other Starbucks customers. *Id.* . Jackson had recently obtained housing after living in a homeless shelter, and his "clothes situation wasn't all that great at the time" (Jackson Tr. 225:5–227:9): "I probably had on some jeans probably was too big for me and, you know, the shirt probably was wrinkled or

whatever that be. I wasn't dressed up to my best potential" ((*id.* at 225:9–14). According to

Ward, Jackson "looked a little beat up or grungy"; his clothes were the color of "washed-too-

many-times black." Ward Tr. 135:14–136:10, 221:7–22. "Mr. Jackson has a look, like he's a drug

user or that he abuses drugs. He has that look. I don't think he had any teeth in his mouth, and if

he did, he didn't have the top ones." *Id.* at 225:1–4.

     This evidence is more than enough to survive summary judgment.

## II.    Jackson states negligence claims against Starbucks and White-Hunt.

     A traditional common-law negligence action requires a plaintiff to establish (1) a duty of

care owed by the defendant to him (or to a class of which he is a member); (2) a breach of that

duty; and (3) damages (4) proximately caused by the breach. *Griffin v. Acacia Life Ins. Co.*, 925

A.2d 564, 575 (D.C. 2007). The Court has already found that the facts—as pleaded—are

sufficient to state a claim. The Court already held that the complaint stated claims for negligence,

*see Jackson*, 2021 U.S. Dist. LEXIS 68207, at *14. Now armed with admissible evidence,

Jackson's claims are even stronger.

### A.  The Court has already held that the pleadings allege negligence.

     Starbucks's brief opens by retreading old ground—the pleadings—arguing that the

amended complaint only supports an intentional tort, but "'[i]ntent and negligence are regarded

as mutually exclusive,'" so "an intentional act does not support a negligence claim." Mot. 9

(quoting *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003)). But as Starbucks

concedes, this principle only comes into play in the "absen[ce of] evidence of negligence." *Id.*

(quoting *Chinn*, 839 A.2d at 710). A negligence claim fails "where the plaintiff does not allege or

prove a distinct negligence ground," but may proceed along with a battery claim where, "on the

facts of a particular case, [there is] sufficient evidence to submit the question of negligence as well." *Chinn*, 839 A.2d at 710 (quotation marks and citation omitted).

### B. The facts support a finding of negligent supervision against Starbucks and White-Hunt.

The tort of negligent supervision "allows a plaintiff to hold employers directly liable for their failure to properly supervise their personnel." *James v. Dist. of Columbia*, 869 F. Supp. 2d 119, 121 (D.D.C. 2012); *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 575 (D.C. 2007). To properly state a negligent-supervision claim, a plaintiff must establish "that the employer breached a duty to [the] plaintiff to use reasonable care in the supervision . . . of an employee which proximately caused harm to plaintiff." *Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002). This requires that the plaintiff show "(1) that [Defendants] 'knew or should have known its employee[s] behaved in a dangerous or otherwise incompetent manner,' and (2) that [Defendants], 'armed with that actual or constructive knowledge, failed to adequately supervise [its employees].'" *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 79 (D.D.C. 2005) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613) (D.C. 1985); *District of Columbia v. Tulin*, 994 A.2d 788, 794 (D.C. 2010) (same).

An "essential element" of any negligence claim under District of Columbia law is "[t]he existence of a legal duty." *Simms v. Dist. of Columbia*, 699 F. Supp. 2d 217, 227 (D.D.C. 2010) (quoting *Dist. of Columbia v. White*, 442 A.2d 159, 162 (D.C. 1982)). But employers "dealing with the public" have a general legal duty "to use reasonable care to select, retain and supervise employees such that they are competent and fit for the work assigned to them." *Newman v. Borders, Inc.*, 530 F. Supp. 2d 346, 350 (D.D.C. 2008) (noting, "[t]he cause of action for negligent supervision recognizes that an employer owes specific duties to third persons based on

the conduct of its employees") (citing *Griffin*, 925 A.2d at 575). In addition, agents of an employer may be personally liable "for the conduct of other agents [if] he is at fault in appointing, supervising or cooperating with them." Restatement (Second) of Agency § 358(1). *See also Int'l Longshoremen's Ass'n v. NLRB*, 56 F.3d 205, 213 (D.C. Cir. 1995) (acknowledging "the common law principle that one agent is liable for the tortious actions of another if he or she directs such actions." (citing Restatement (Second) of Agency § 358(1)).[5] Thus, a supervisor is liable if he is "negligent or reckless" in "giving improper or ambiguous orders o[r] in failing to make proper regulations," "the supervision of the activity," or "permitting, or failing to prevent, negligent or other tortious conduct by persons . . . upon premises . . . under his control." *District of Columbia v. Tulin*, 994 A.2d at 794 (quoting Restatement (Second) of Agency § 213 (1958)) (additional citation omitted).

Courts have recognized that a negligent-supervision claim may be brought when a supervisor only has contemporaneous notice of a subordinate's dangerous or incompetent action. For example, in *Spicer v. District of Columbia*, the court found that allegations that a prison supervisor "was negligent in failing to adequately supervise the other officers [on] the night of the incident," and due to the lack of adequate supervision, "they attacked an inmate and broke his foot," was sufficient to show that the supervisor "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner." 916 F. Supp. 2d 1, 3 (D.D.C. 2013). Similarly, in *Godfrey v. Iverson*, the D.C. Circuit upheld a jury verdict that found a basketball

---

[5] Starbucks, at 11–12, cites no law for the proposition that supervisory employees are immune from liability for their own negligence in supervising them. But the source on which it relies holds that "[a] person" can be liable for their own negligent supervision of "other agents." Mot. 12 (citing Restatement (Second) of Agency § 213 (1958)). White-Hunt is a person who negligently supervised Washington, an "other agent" under his direct supervision.

player liable for negligently supervising his bodyguard when he failed to "say or do anything to try to stop" his bodyguard from fighting and injuring the plaintiff in nightclub brawl. 559 F.3d 569, 571 (D.C. Cir. 2009). The jury had been presented evidence that during the melee, the basketball player had simply stood by and observed the proceedings, and "did not say or do anything to try to stop [his bodyguard] or anyone else from fighting." *Id.* Based on this evidence, the jury concluded that this was enough to find that the basketball player "knew or should have known [that his bodyguard] behaved in a dangerous or otherwise incompetent manner." *Id.* Moreover, the D.C. Court of Appeals has noted in dicta, (while considering the separate question of the type of predicate act that can properly support a common law claim of negligent supervision), that a "negligent supervision claim predicated on a battery might be pursued under a theory that the employer was negligent *in allowing the battery to happen*." *Griffin*, 925 A.2d at 575–77 (emphasis added).

The facts support such a finding here. Starbucks's written training materials tell all employees that if a customer is "disruptive," the employee should "approach the customer" and may "physically confront that person." Ex. 16 (Starbucks 2900); White-Hunt Tr. 152:2–153:19. Although the manager "would ideally be the best person to do so," other employees—even baristas—may physically confront customers if "they feel uncomfortable." White-Hunt Tr. 152:14–153:11. In fact, at the Gelman Library Starbucks, the duty of physical-confrontation typically fell to subordinates, because White-Hunt was "a manager that avoided confrontation" and would "ignore or not handle conflict situations." Ward Tr. 40:4–17. According to Ward, White-Hunt had a habit of "do[ing] nothing and let[ting] things just go from zero to 100." *Id.* at 41:2–7.

A jury could reasonably conclude that White-Hunt's fear of confrontation, and his willingness to encourage baristas—especially 6'6", 300 pound baristas like Washington—to "physically confront" disruptive customers for him, was unreasonable. According to Ward, in light of White-Hunt's abdication of his supervisory role, Washington "was the best size, he was at the right place, the right time, to handle the situation because when it was going down, nobody was doing nothing." Ward Tr. 41:8–12. Thus, a jury could find that White-Hunt's actions *before* the incident allowed the battery to happen. *Accord Griffin*, 925 A.2d at 575–77.

A jury also could reasonably conclude that White-Hunt did not do enough to prevent Washington from pushing Jackson after the physical confrontation began. By his own admission, White-Hunt "believed that removing Mr. Washington from the situation would make the situation safer" (*id.* at 283:17–284:3), but his efforts—if any—were unsuccessful (*id.* at 279:10–13). After Washington pushed Jackson once, Jackson said, "'don't put your hands on me no more,' . . . thinking at that point the manager would step in between," but instead, Washington pushed him a second time. Jackson Tr. 246:6–14. A jury could reasonably conclude that "[w]hile the fight may have occurred suddenly, [White-Hunt] could have said something or intervened to stop Washington's actions," and such a finding would be "sufficient to state a negligent supervision claim." *Jackson*, 2021 U.S. Dist. LEXIS 68207, at *12.

### C. A jury could reasonably find Washington negligent.

Although Jackson asserts that Washington's actions were intentional, nothing prevents a jury from concluding that Washington acted with a lesser degree of culpability. Ward's recollection of the incident—although wildly inconsistent with the surveillance video—would support a conclusion that Washington merely intended to get Jackson to leave the store, inadvertently causing Jackson to trip while walking backwards, or perhaps to fall as a result of

unintentional physical contact resulting from the way Washington attempted to physically "usher" Jackson from the store. *See, e.g.*, Ward Tr. 168:1–20 (noting that perhaps Jackson "lost his balance" when Washington forced him to walk backwards towards the door); *id.* at 32:9–33:16 ("I believe with Richard trying to usher the man out, Richard holding his body or posing a certain way to control the man from getting past him, I believe the man may have hit Richard . . . like a brick wall," but "Richard's body stance was so solid that it caused the man to fall."). If the jury finds Ward's recitation of the facts credible, it could support a finding of negligence against Washington.

**D. Expert testimony is not necessary to establish the duties in this case.**

Finally, at 10–11, Starbucks argued that all negligence theories must be dismissed because Jackson has not presented expert testimony on the standard of care. Starbucks is wrong.

A plaintiff is only required to proffer expert testimony on the relevant standard of care "if the subject in question is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson." *Godfrey v. Iverson*, 559 F.3d 569, 571 (D.C. Cir. 2009). But it is not always "required to establish the standard of care in cases involving supervision . . . ." *Id.* at 572. When it comes to expert testimony, "the factual context matter[s]." *Id.* at 573. Expert testimony is necessary if "lay jurors would be unable to grasp the issues without expert assistance," *District of Columbia v. Tulin*, 994 A.2d 788, 795 (D.C. 2010), but unnecessary when "everyday experience makes it clear that jurors could not reasonable disagree over the care required." *Briggs v. Wash. Met. Area Trans. Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007). Regardless, "the decision of whether to require expert testimony on a particular claim varies by case, and is left to the sound discretion of the district court." *Flythe*, 994 F. Supp. 2d 50, 69

(D.D.C. 2013) (citing *Varner v. District of Columbia*, 891 A.2d 260, 266 (D.C. 2006) (additional citation omitted).

In the context of police supervision, expert testimony was required when "it was not obvious that the District as supervisor had done anything wrong, and therefore the plaintiff needed to establish a standard of care to serve as a benchmark for the defendant's behavior." *Flythe*, 994 F. Supp. 2d at 70 (citing cases). But expert testimony was not required when "the supervisory police officers were physically present on the scene and were negligent in supervising the subordinate officer during that officer's altercation with the plaintiff." *Id.* (citing cases). No expert testimony was required when a supervisor was present and failed to stop an employee from committing a wrongful act, *Godfrey*, 559 F.3d at 573; when supervisors failed to "notice, let alone stop, a continuing series of evening stripteases, accompanied by blaring music, and guard-on-inmate violence," *Daskalea*, 227 F.3d at 445; or when supervising officers watched a subordinate effectuate an arrest they knew lacked probable cause, *Tulin*, 994 A.2d at 795–798.

Similarly, a standard-of-care expert was necessary in a case involving cushioning installation under playground monkey bars, *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995), but not to establish whether holes in the side rails of a playground slide created an unreasonably dangerous condition, *District of Columbia v. Shannon*, 696 A.2d 1359, 1365–66 (D.C. 1997). "It takes no expert knowledge of human behavior to know that children stick their fingers in holes." *Id.* at 1365.

Similarly, it takes no expert in human behavior or physics to understand that having a 6'6" 300-pound man physically confront "belligerent" customers half his size might escalate an

otherwise verbal confrontation into a physically dangerous one; and standing idly by after that 300-pound man pushes an "elderly, weak" half his size (Ward Tr. 38:11–12), might cause injury.

For these reasons, Jackson's negligence claims survive.

## III.     Starbucks may be held liable for Washington's battery.

Finally, Starbucks argues that it cannot be vicariously liable via *respondeat superior* for Washington's battery of Jackson because no jury could find that his intentional tort was within the scope of employment. Mot. 13–14. Not so.

In the District, an employer is not liable for an employee's actions "only . . . to further his own interests," but is liable "if the employee acts in part to serve his employer's interest . . . , even if prompted partially by personal motives, such as revenge." *Hechinger v. Johnson*, 761 A.2d 15, 24 (D.C. 2000) (citing *Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C. 1986)). Thus, if an "assault grew out of a job-related controversy," the employer can be held liable. *Id.* (a jury could find that assault on customer was at least partially "motivated by a desire to require [plaintiff] to pay").

Here, Washington's actions against Jackson indisputably arose out of a job-related controversy. Washington followed Starbucks's formal protocol when he "confronted" Jackson (Ex. 16; White-Hunt Tr. 152:2–153:11), and the battery arose out of that confrontation. The fact that the ultimate action—the intentional touching—violated Starbucks's formal policies does not take it outside of the scope of Washington's employment, which encouraged him to "physically confront" Jackson in the first place.

## CONCLUSION

Starbucks' motion should be denied.

Respectfully submitted,

/s/ Timothy R. Clinton
Timothy R. Clinton (D.C. Bar No. 497901)
Gregory M. Lipper (D.C. Bar No. 494882)
CLINTON & PEED
1775 Eye Street NW, Suite 1150
Washington, DC 20006
(202) 919-9491
tim@clintonpeed.com
glipper@clintonpeed.com

*Counsel for Plaintiff*

June 30, 2021