### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| HAROLD STANLEY JACKSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 19-1487 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 46, 48, 55 |
| | : | | |
| STARBUCKS CORPORATION, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

### MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT'S SEALED MOTION FOR LEAVE TO FILE CERTAIN EXHIBITS UNDER SEAL; GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE A SURREPLY**

## I. INTRODUCTION

The Plaintiff, Mr. Harold Stanley Jackson, entered a Starbucks store, selected some packaged cookies, and had started to get in line to purchase them when the cashier made a comment implying that he intended to steal the cookies. A verbal disagreement ensued, the manager became involved, and another Starbucks employee told Mr. Jackson to leave and pushed him to the ground—causing Mr. Jackson to lose consciousness and suffer injuries. Beyond this broad level of events, however, the details of the altercation and the motivations of the individuals involved are subject to a range of interpretations and competing characterizations. Because weighing those characterizations and drawing those inferences is a task for the jury, the majority of Mr. Jackson's claims survive the summary judgment stage intact.

## II. BACKGROUND

On April 24, 2018, at a few minutes past 12 p.m., Mr. Jackson entered the Gelman Library Starbucks on the George Washington University Campus in Washington, D.C. Defs.'

Statement of Undisputed Material Facts ("Defs.' SUMF") ¶ 8, ECF No. 46-1; Pl.'s Resp. Defs.'

Statement Material Facts ("Pl.'s Fact Resp.") ¶ 8, ECF No. 50-13.  Mr. Jackson was a regular

customer of that particular Starbucks.  Pl.'s Fact Resp. ¶ 7.  Although the exact details of Mr.

Jackson's appearance that day are contested, the parties agree that he was not especially well-

dressed.  Pl.'s Counterstatement Undisputed Material Facts ("Pl.'s SUMF") ¶ 21, ECF 50-14;

Defs.' Resp. Pl.'s Counterstatement Material Facts ("Defs.' Fact Resp.") ¶ 21, ECF No. 54-1.

Mr. Jackson testified that because he had recently found housing and moved out of a shelter, his

"clothes situation wasn't all that great," and a Starbucks employee who was a witness that day

recalled that Mr. Jackson "looked a little beat up or grungy" and had "a look, like he's a drug

user."  Pl.'s SUMF ¶¶ 21, 24–25 (quoting Deposition Tr. Harold Jackson at 225:5–227:9, Ex. 3

of Defs.' Opp'n ("Jackson Dep. Tr."), ECF No. 46-5 and Deposition Tr. Charlene Ward at

221:7–22, 225:1–4, Ex. 13 of Pl.'s Opp'n ("Ward Dep. Tr."), ECF No. 50-5); *see also* Defs.'

Fact Resp. ¶¶ 21, 24–25 (disputing only the materiality of these statements).  After entering the

store, Mr. Jackson walked to the front counter and selected two bags of packaged cookies.

Defs.' Fact Reply ¶ 28.  The video surveillance footage shows him slowly selecting the cookies

and holding them in full view before walking toward the end of the line and away from the exit.

Ex. 5 of Defs.' Mot. at 12:08:44–55.

Accounts of what happened next diverge.  According to the Defendants, the cashier

Chelsea Robinson called out, "Sir, you have to pay for those."  Defs.' SUMF ¶ 13.  According to

Mr. Jackson, Ms. Robinson spoke loudly and used the phrase "Hey, you" before telling Mr.

Jackson, in a condescending tone, that he had to pay for the cookies.  Pl.'s Fact Resp. ¶ 13;

Jackson Dep. Tr. 212:17–213:8.  The Defendants claim that Mr. Jackson then became

"belligerent" and made "verbal threats" toward Ms. Robinson, Defs.' SUMF ¶¶ 14–15, whereas

Mr. Jackson insists that he maintained a calm demeanor throughout, Pl.'s Fact Resp. ¶¶ 14–15. Mr. Jackson asked to speak to a manager, and Defendant Dan White-Hunt, who was the Store Manager at that location, came out from the back to speak to him.  Pls.' Fact Resp. ¶¶ 16–17; Ex. 5 of Defs.' Mot. at 12:10:46–11:08.

The conversation between Mr. White-Hunt and Mr. Jackson lasted only a few minutes. Defs.' Fact Resp. ¶ 45.  After the conversation, Mr. Jackson returned to the end of the line, just out of range of the video.  Ex. 5 of Defs.' Mot. at 12:12:34–41.  He claims he was waiting there "in a non-threatening manner" when another Starbucks employee by the name of Richard Washington, who was over six feet tall and twice Mr. Jackson's weight, approached him, with Mr. White-Hunt close behind.  Pl.'s SUMF ¶¶ 46–49.  Defendants dispute all these assertions, Defs.' Fact Resp. ¶¶ 46–49, and instead claim that Mr. Washington "approached Mr. Jackson to calm him down and ask him to leave the store after Mr. Jackson continued to behave belligerently," Defs.' SUMF ¶ 18.  Mr. Jackson also claims that Mr. Washington's involvement was in accordance with company policy to "physically confront" disruptive customers in some instances, pointing to Mr. White-Hunt's testimony to that effect.  Pl.'s SUMF ¶ 51; *see also* Tr. White-Hunt Deposition at 153: 12–19, Ex. 14 of Pl.'s Opp'n ("White-Hunt Dep. Tr."), ECF No. 50-6 ("Q: And so does the training say that if someone is being verbally disruptive that a Starbucks partner should physically confront that person? A: If they feel comfortable. Q: If they feel comfortable doing so they should physically confront the person? A: Yes.").

Again, the precise details of the interaction between Mr. Washington and Mr. Jackson are contested, but it is undisputed that Mr. Washington "shoved" Mr. Jackson, who ended up motionless on the ground.  Pl.'s Fact Resp. ¶ 19.  Mr. Jackson's fiancée, Jillian Workman, who had been waiting outside and did not witness the incident, entered the store at that point, found

Mr. Jackson on the floor, and believed that he was having a seizure.  Defs.' Fact Resp. ¶¶ 61–62.

Charlene Ward, another Starbucks employee who was present that day, testified that the

employees were surprised that Ms. Workman was with Mr. Jackson because "she was a white

lady . . . she looked all right, and he was a black man, and he looked a little beat up or grungy

and they were together."  Ward Dep. Tr. at 221:19–22.  George Washington University

Hospital's Emergency Medical Response Group arrived shortly thereafter.  Defs.' Fact Resp.

¶ 64.  The emergency medical technicians found Mr. Jackson unconscious, administered oxygen,

and took him to the University Hospital on a stretcher.  Pl.'s SUMF ¶¶ 65–69; Defs.' Fact Resp.

¶¶ 65–69.  Later that afternoon, Mr. White-Hunt reported the incident to the Starbucks customer

care support team and the District Manager, and he took written statements from the employees

who had witnessed the incident.  Pl.'s Fact Resp. ¶¶ 20–22.  Mr. Washington was issued a

written warning on approximately May 8, 2018.  *Id.* ¶ 23.

　　　Mr. Jackson now asserts claims of negligence and negligent supervision (Count I),

battery (Count II), race and personal appearance discrimination under the D.C. Human Rights

Act ("DCHRA") (Count III), and race discrimination in violation of 42 U.S.C. § 1981 (Count

IV).  *See generally* Am. Compl., ECF No. 22.  The instant action was removed from the D.C.

Superior Court on May 21, 2019.  *See* Notice of Removal at 1.  This Court has original

jurisdiction over the claim for race discrimination in violation of Section 1981 and supplemental

jurisdiction over each of the other claims pursuant to 28 U.S.C. §§ 1367(a) and 1441(c).  *Id.*

## III.  ANALYSIS

### A.  Defendant's Motion for Leave to File Video Exhibits Under Seal

　　　The Court begins by resolving a dispute over two exhibits that the Defendants seek to file

under seal.  The two exhibits are surveillance videos recorded in the Starbucks store during the

time of the incident.  *See* Def. Starbuck Corp.'s Opposed Mot. File Under Seal Certain Exs. ("Sealing Mot."), ECF No. 48.  Starbucks requests that these exhibits be sealed, offering as justification concerns over store security and the personal and financial privacy of the customers depicted in the videos.  *Id.* at 4.

"The common-law right of public access to judicial records 'is a fundamental element of the rule of law, important to maintaining the integrity and legitimacy of an independent Judicial Branch.'"  *In re Leopold to Unseal Certain Elec. Surveillance Applications & Orders*, 964 F.3d 1121, 1127 (D.C. Cir. 2020) (quoting *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 663 (D.C. Cir. 2017)).  If a document is a judicial record, a "strong presumption in favor of public access" applies.  *In re Leopold*, 964 F.3d at 1127 (quoting *United States v. Hubbard*, 650 F.2d 293, 317 (D.C. Cir. 1980)).  The Court has little difficulty concluding that video exhibits 4 and 5 are judicial records, because they "were filed before the district court's decision and were intended to influence it."  *Metlife*, 865 F.3d at 668; *see also League of Women Voters of U.S. v. Newby*, 963 F.3d 130, 136 (D.C. Cir. 2020).  However, this presumption "may be outweighed by competing interests" after balancing the "public and private interests at stake."  *MetLife*, 865 F.3d 665.  District courts in this Circuit balance those competing interests by applying the six-factor *Hubbard* test, which considers: (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure;[1] and (6) the

---

[1] The fifth factor refers to "legal prejudice—i.e., harm in future litigation" rather than general reputational harm or inconvenience.  *Zapp v. Zhenli Ye Gon*, 746 F. Supp. 2d 145, 150 (D.D.C. 2010).  Starbucks does not identify any harm to its interests in future litigation that would flow from release of the videos, making the fifth factor inapplicable here.

purposes for which the documents were introduced during judicial proceedings.  *Hubbard*, 650

F.2d at 317–23.

First, the "fact that documents are 'specifically referred to in the trial judge's public

decision' creates a public need for those documents."  *EEOC v. Nat'l Children's Ctr., Inc.*, 98

F.3d 1406, 1411 (D.C. Cir. 1996) (quoting *Hubbard*, 650 F.2d at 318).  It is "a fundamental

norm of our judicial system[] that judges' decisions and their rationales must be available to the

public."  *Metlife*, 865 F.3d at 675.  Because the Court relied on the videos in order to reach its

decision, there is a strong public interest in disclosure.  The first factor substantially overlaps

here with the sixth—the purposes for which the documents were introduced—because the

documents were introduced as evidence in order to help the Court reach its decision.  *See*

*Hubbard*, 650 F.2d at 321.  Allowing the public to view the videos "will promote the integrity of

the judicial process" by enabling members of the public "to consider for themselves the merits"

of the Court's decision.  *In re Nat. Broad. Co., Inc.*, 653 F.2d 609, 614 (D.C. Cir. 1981).  The

first and sixth factors therefore weigh strongly in favor of disclosure.

The second factor—the extent of prior public access to the videos—tips only slightly in

favor of sealing.  The full videos were filed under seal and have only been produced to the

parties themselves.  *See* Def. Starbucks Corp.'s Reply Further Supp. Mot. Seal ("Sealing Reply")

at 2, ECF No. 53.[2]  But Mr. Jackson also correctly points out that multiple screenshots of the

---

[2] Mr. Jackson makes much of the fact that the videos were first produced by Starbucks without a confidentiality designation and prior to the entry of a protective order, even seeking leave to file a Surreply to establish that point and the arguably misleading characterization of the prior release in Starbucks's Reply brief.  *See* Pl.'s Mot. Leave to File Surreply to Def. Starbucks' Mot. File Under Seal Certain Exs., ECF No. 55; *see also* Pl.'s Surreply at 2, ECF No. 55-1 (clarifying the timing of the prior release).  A court determining whether to allow a surreply considers whether the reply raises new arguments, whether the proposed surreply would be helpful to the resolution of the pending motion, and whether the other party would be unduly prejudiced.  *Glass v. Lahood*, 786 F. Supp. 2d 189, 230–31 (D.D.C. 2011).  "[T]he determination

same videos are already part of the public record in the Amended Complaint.  *See* Pl.'s Opp'n

Def. Starbucks' Mot. File Under Seal Certain Exs. ("Sealing Opp'n") at 1, ECF No. 51.  The

screenshots would seem to implicate the exact same security and privacy concerns that Starbucks

relies on in its request to seal the full video exhibits.  Thus, the prior availability of those

screenshots at least somewhat undermines the weight of this factor.

      Starbucks concentrates its main arguments on the third and fourth factors, asserting that

unsealing would jeopardize store security and implicate the privacy interest of the third party

customers who appear in the video.  With respect to the argument that "the footage discloses

camera angles and blind spots," the Court is not convinced.  *See* Sealing Mot. at 4.  Mr. Jackson

argues that because there were other cameras in that store whose surveillance footage has not

been filed, it is uncertain whether any such deduction is even possible, or if any there would be

any validity to such a deduction nearly four years later.  *See* Sealing Opp'n at 2–3.  In addition,

the screenshots already in the public record likewise show those exact camera angles.  *See, e.g.*,

Am. Compl. ¶¶ 27, 33.  Starbucks's interest in maintaining the confidentiality of these two

camera locations is not enough to overcome the presumption of public access to the videos.

---

of whether to grant or deny leave is entrusted to the sound discretion of the district court."  *Id.* at
231.  Starbucks's argument that it produced the videos during the mediation process with an
understanding of confidentiality was articulated for the first time in its Reply brief, albeit in
response to Mr. Jackson's contrary assertion in the Opposition.  *See* Sealing Opp'n at 1
("Starbucks . . . produced the videos to Jackson in October 2019 (a month before the parties even
discussed a protective order in this case . . . .)"); Sealing Reply at 2 ("Starbucks agreed to
produce the surveillance footage, which had not been publicly shared, and certain other
documents in or around January 2020, to foster a fruitful discussion during a mutually requested
Mediation later that month.").  Regardless, the exact timing is irrelevant to this factor because the
videos were only ever produced to Mr. Jackson himself and have not been disseminated to the
general public. Because the information provided in the Surreply generally responds to a new
argument, the Court grants Mr. Jackson's motion and will deem the proposed surreply filed, but
consideration of this information does not ultimately impact the Court's analysis of the *Hubbard*
factors.

Starbucks's privacy argument on behalf of its customers fares somewhat better.  Litigants "have a lesser claim to privacy than third parties," *McConnell v. Fed. Election Comm'n*, 251 F. Supp. 2d 919, 932 (D.D.C. 2003), but Starbucks has objected to disclosure at least in part on behalf of its third party customers who appear in this video and have no relation to this litigation. No third parties have filed an objection, "which the Circuit in *Hubbard* found to be particularly problematic," *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 141 (D.D.C. 2012), but it is difficult to see how most of them could have objected given the limited public availability of the videos so far.  Although a few faces do appear in the screenshots of the amended complaint, there are numerous other individuals who appear over the course of the video and have no way of knowing that their identity or whereabouts on that date could potentially become part of the public record in this case.  For all these individuals, their appearance in a public space diminishes, but does not eliminate, their privacy interest.  *Cf. Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) ("A person does not surrender all Fourth Amendment protection by venturing into the public sphere.").[3]  Nevertheless, because crucial parts of the incident occurred outside of the camera range, the reactions and facial expressions of the customers themselves carry some probative value.  *See, e.g.*, Am. Compl. ¶ 29 (showing the surprised expressions of customers at the front of the line in the moment of the alleged battery).

Finally, one of the cameras shows the cashier transactions of those parties, potentially exposing those individuals to financial risk in addition to potential discomfort or embarrassment.

---

[3] Mr. Jackson counters that this factor weighs in favor of disclosure because it could allow him to identify disinterested witnesses to the events of that day.  Sealing Opp'n at 3.  But Mr. Jackson already has access to the videos and has identified no additional witnesses.  His speculation that release of the videos will alert third-party witnesses to the existence of this lawsuit and that they will come forward to testify is, indeed, highly speculative.

Mr. Jackson argues that "it does not appear possible for a bad actor to discern private information like credit card numbers from the grainy surveillance videos."  Sealing Opp'n at 3. But the Court is hesitant to assume, without any evidentiary support, that it would not in fact be possible.  *See* Sealing Mot. at 4.  Not only are these transactions the kind of "sensitive financial information" that traditionally warrants redaction, they carry no evidentiary value or even connection to the litigation at hand, meaning that no public interest would be served by their inclusion in the public record.  *See McConnell*, 251 F. Supp. 2d at 934 (allowing parties "to redact sensitive financial information, including, but not necessarily limited to, credit card and bank account numbers" where there was no public interest in the release of that information).

After weighing these factors, the Court does not believe that Starbucks has overcome the strong presumption of public access to maintain these two video exhibits entirely under seal. However, it recognizes that third parties on the videos have a privacy interest in their financial transactions that could be implicated by release.  The Court will therefore grant Starbucks's motion to seal in part, allowing it to blur or otherwise redact the financial transactions of third-party customers who had no involvement with the incident that day in Exhibit 5, and will deny the motion in all other respects.

### B.  Motion for Summary Judgment Legal Standard

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard serves to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material

fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  If the moving party meets this burden, then the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See Celotex*, 477 U.S. at 324.  A "material" fact is one capable of affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  The nonmovant must provide evidence that would permit a reasonable jury to find in his or her favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

When evaluating whether a genuine dispute of fact exists, a court must refrain from making credibility determinations or weighing the evidence; rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). However, a conclusory assertion offered without any evidentiary support does not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  And because the nonmovant's evidence must allow a reasonable jury to find in its favor, "merely colorable" or "not significantly probative" evidence will not preclude summary judgment.  *Potter v. District of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009) (quoting *Anderson*, 477 U.S. at 249–50).

### C.  Discrimination Claims

In Counts III and IV, Mr. Jackson asserts claims for discrimination on the basis of race under 42 U.S.C. § 1981, and race and personal appearance in violation of the D.C. Human Rights Act.  The Court addresses each in turn.

1.  42 U.S.C. § 1981 (Count IV)

42 U.S.C. § 1981 protects the right of all persons within the United States to make and

enforce a contract free from racial discrimination—and thus prohibits refusals of service based

on race.  42 U.S.C. § 1981(a).  "The allocation of burdens in a § 1981 case is governed by the

burden-shifting analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),"

in which the plaintiff first bears the burden of establishing a *prima facie* case for discrimination,

after which the burden of production "shifts to the defendant to state a legitimate, non-

discriminatory reason for the lack of service," and finally the plaintiff has the opportunity to

show by a preponderance of evidence that the stated reason was pretextual.  *Mitchell v. DCX,*

*Inc.*, 274 F. Supp. 2d 33, 45 (D.D.C. 2003) (quotations omitted).  The shifting burden under

*McDonnell Douglas* is one of production, but "[t]he ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times with

the plaintiff."  *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

a.  Prima Facie *Case for Discriminatory Refusal of Service*

To establish a *prima facie* claim for a discriminatory refusal of service under § 1981, "a

plaintiff must show that (1) he or she is a member of a racial minority group; (2) the defendant

had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or

more of the activities enumerated in the statute."  *Mitchell*, 274 F. Supp. 2d at 45–46 (quoting

*Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996) (internal alterations omitted)).

"Jackson is an African American man, and a refusal of service is a covered activity under the

statute," meaning that "the only element in dispute" is whether the Defendants had an intent to

discriminate against him on the basis of race.  *See Jackson v. Starbucks Corp.*, No. 19-cv-1487,

2021 WL 1317883, at *8 (D.D.C. Apr. 8, 2021).  This Court previously determined at the motion

to dismiss stage that Mr. Jackson had pleaded sufficient facts to establish that element. *Id.* The question now is whether, at the summary judgment stage, "a reasonable factfinder in a Title VII case could infer discrimination based on the evidence submitted." *Hastie v. Henderson*, 121 F. Supp. 2d 72, 77 (D.D.C. 2000), *as amended* (Nov. 20, 2000), *aff'd sub nom. Hastie v. Potter*, No. 00-5423, 2001 WL 793715 (D.C. Cir. June 28, 2001). The Court concludes that there is sufficient evidence from which a reasonable jury could infer discriminatory intent.

Defendants' primary argument is that the racial discrimination could not have motivated the incident because the cashier who accused Mr. Jackson of stealing and the Starbucks employee who physically confronted him were also black. Defs. Starbucks Corp. & Dan White-Hunt's Mem. P. & A. Supp. Mot. Summ. J. ("Defs.' Mot.") at 15, ECF No. 46-2. Although they cite cases suggesting that a shared racial identity may undermine an inference of discriminatory intent, those cases do not foreclose the possibility that an individual might discriminate against someone of their own race. *See Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) (stating only that in the employment context, "a replacement within the same protected class cuts strongly against any inference of discrimination"); *Hardy v. Marriott Corp.*, 670 F. Supp. 385, 392 (D.D.C. 1987) (noting that the fact that the individual who had made an employment decision was "of the same race as plaintiff which makes any claim of racial discrimination suspect"). Mr. Jackson testified that "many times" he had "seen people not of my race pick things up off the counter and get in line and nothing was said." Jackson Dep. Tr. 125: 17–19; *see also id.* at 209:6–8 ("I seen plenty . . . of Caucasian peoples do that plenty of times . . . . And nothing was said to them."). A reasonable factfinder could infer that such differential treatment occurred because of Mr. Jackson's race even though the employee making the accusation was a member of the same race. *See Williams v. Wendler*, 530 F.3d 584, 587 (7th Cir. 2008) ("There

can, it is true, be 'racial' discrimination within the same race, broadly defined, because 'race' is a fuzzy term . . . ."). For instance, another court in this district determined that a bank teller's suspicion that the plaintiff "did not 'look' like a business owner" "may be a potential manifestation of race discrimination" even though the bank teller was a member of the same race. *Banks*, 505 F. Supp. 2d at 168 & n.12. And of course, Mr. White-Hunt—the manager whose actions allegedly contributed to Mr. Jackson's injuries—was white, making this particular argument wholly inapplicable to him.

As Defendants point out, Mr. Jackson also testified to having himself taken items off the counter on many previous occasions without being accused of stealing, Jackson Dep. Tr. at 223:13-22, 224:1-18. That could undermine an inference that Mr. Jackson was discriminated against on the basis of race that day, but it is not so overwhelming that no reasonable factfinder could find otherwise, particularly given that Mr. Jackson also testified that he had never interacted with that particular cashier before. *Id.* at 197:5–7. As the Fourth Circuit recently explained in a § 1981 case in which a city approved a loan for a minority-owned business and then later revoked it, "it is unlikely today that an actor would explicitly discriminate under all conditions; it is much more likely that, where discrimination occurs, it does so in the context of more nuanced decisions that can be explained based upon reasons other than illicit bias, which, though perhaps implicit, is no less intentional." *Woods v. City of Greensboro*, 855 F.3d 639, 651–52 (4th Cir. 2017). It admonished that "imposing unique burdens or stereotypical expectations on an individual based on her membership in a protected group is illicit discrimination, even though the defendant may not discriminate consistently against *every* woman or minority under *all* conditions." *Id.* at 651 (emphasis in original).

Mr. Jackson's belief that his race played a role in his treatment that day[4] is bolstered by evidence of bias both in Starbucks nationwide and the Gelman Library store.  Around the same time as this incident, Starbucks employees in Philadelphia called the police on two black men in an incident the company's CEO acknowledged as "reprehensible," and Starbucks proceeded to close its stores for a day to provide training for its employees on racial inequity and implicit bias a few weeks later.  *See* Am. Compl. ¶¶ 12–14, 40; *see also* Starbucks's Am. Answer to Am. Compl. ¶¶ 12–14, ECF No. 33 (admitting the incident and the statement but averring that those facts are irrelevant and admitting that stores were closed in May for "implicit bias education").[5] One employee also testified that there was a perception among some of the staff "that [Mr. White-Hunt] had implicit bias," as demonstrated by referring to black employees as "rachet," "ghetto," and "savage" when they did not perform well.  *Id.* at 96:18–20.  To be sure, Defendants dispute these allegations about the Gelman Library store.  Defs.' Fact Resp. ¶¶ 77–81.  But it is not for the Court to decide at the summary judgment stage which party's version of events is more credible; it only acknowledges that a reasonable factfinder could choose to credit Mr. Jackson's evidence.

Defendants suggest that this Court should apply a similar test articulated in *Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 704–08 (D. Md. 2000), which further elaborates on

---

[4] Defendants relatedly argue that Mr. Jackson has undermined his own case by answering "no" when asked "And you think that the altercation at Starbucks happened because you're a black man?"  Defs.' Reply at 12, ECF No. 54.  Such inconsistency could undermine Mr. Jackson's credibility with a jury, but it does not defeat summary judgment altogether when other parts of his testimony do articulate such a belief.  *See* Jackson Dep. Tr. at 195:10–19 ("I picked something off the counter and took it and got in line and they took it and tried to make it look like that I was actually attempting to take something when I wasn't. Q And how do you connect that with you being black? A Because many times I have went in Starbucks I have seen people not of my race pick things up off the counter and get in line and nothing was said.").

[5] The Court expresses no opinion at this stage about whether evidence regarding the Philadelphia incident would be admissible at trial.

the showings needed to establish an inference of unlawful discrimination in a retail setting.  *See*

Defs.' Reply Further Supp. Mot. Summ. J. ("Defs.' Reply") at 2, ECF No. 54.  *Callwood*

requires the plaintiff customer to show that:

> [They] did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that
>
> (a) [they] were deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or
>
> (b) [they] received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.

*Callwood*, 98 F. Supp. 2d at 707.  This Court agrees with another court in this district that the

*Callwood* test "is sensible for the purposes of Section 1981 claims in the commercial context,"

with the recognition that "customers may not always have available to them the type of

comparator data that is available in the employment context, since their claims will often arise

from limited, one-off interactions with service-industry establishments."  *Bonner v. S-Fer Int'l,*

*Inc.*, 207 F. Supp. 3d 19, 24–25 (D.D.C. 2016); *see also Banks v. Bank of Am., N.A.*, 505 F.

Supp. 2d 159, 167 (D.D.C. 2007) (adopting the *Callwood* test to "evaluat[e] a § 1981 claim in

the context of interactions in a commercial establishment").

Regardless, the *Callwood* test is not any more favorable to Defendants.  Again, Mr.

Jackson testified that white customers routinely took items off the counter without being accused

of shoplifting, Jackson Dep. Tr. 125:17–19, 209:6–8, in other words, that "similarly situated

persons outside the protected class were not deprived of . . . services" in similar circumstances,

*Callwood*, 98 F. Supp. 2d at 707.  Defendants' focus on similarly situated comparators also

largely misses the point that such a showing is a sufficient, but not necessary, way to satisfy the

*Callwood* test.  Indeed, there is evidence that Mr. Jackson was treated in "a markedly hostile

manner and in a manner which a reasonable person would find objectively unreasonable," the

alternative method for satisfying the *Callwood* test.  *See id.*  Specifically, he testified that the cashier said "Hey, you" in a loud voice and condescendingly accused him of stealing, Jackson Dep. Tr. 261:10–20, and it is undisputed following discovery that he was told that he had to leave the store and "shoved" when he refused to leave, *see* Pl.'s Fact Resp. ¶¶ 18–19.

In short, Mr. Jackson has at this stage collected evidence that corroborates the same allegations that were enough to support a reasonable inference of discrimination at the motion to dismiss stage.  *See Jackson*, 2021 WL 1317883, at *9.  Starbucks has also collected contrary evidence, and it is not the proper moment to weigh the competing evidence.  A reasonable factfinder may not ultimately draw an inference of discrimination, but there is enough evidence with which it could.  "In Title VII cases, courts must view summary judgment with special caution because discriminatory intent and proof of disparate treatment are difficult to establish." *Hastie*, 121 F. Supp. 2d at 77.

### b. Defendants' Asserted Legitimate, Nondiscriminatory Reasons

In the alternative, Defendants assert two related non-discriminatory reasons for Mr. Jackson's treatment.  First, with respect to the cashier's accusation that Mr. Jackson was stealing, Defendants suggest that she simply made a mistake, and that Mr. Jackson's "belligerent" reaction was a non-discriminatory reason to ask him to leave the store.  Defs.' Reply at 5–8. There is testimony that would support this version of events.  For instance, another employee testified that the store had received customer complaints about rude interactions with that cashier, Ward Dep. Tr. 44:6–13, and multiple witnesses testified that Mr. Jackson was verbally confrontational and threatening toward the cashier, *see id.* at 40:17–22 ("I just felt like at that moment . . . when that man was wailing on Chelsea like that—because it looked like if he had

got—kept on arguing, if he kept on getting closer to Chelsea, he may have hit Chelsea."); White-Hunt Dep. Tr. at 254:8–9 ("They were shouting and there was profanity.").

The Court assumes for the sake of argument that both articulated reasons are legitimate and nondiscriminatory.[6] But Mr. Jackson is correct that Defendants' non-discriminatory reasons depend in part on disputed material facts: primarily, whether the cashier had a discriminatory intent in making the accusation that Mr. Jackson was stealing, and whether Mr. Jackson's reaction was even belligerent at all—something his testimony, and to some extent the video footage, suggest may not have been the case. *See* Jackson Dep. Tr. at 245:14–17 ("Q So just so I'm clear on the picture, you were standing in line in a non-threatening way; is that correct? A Yes."); *see generally* Ex. 5 of Defs.' Mot. at 12:08:53–09:12.

Even if Mr. Jackson's testimony was entirely uncorroborated at this stage, "it is up to the jury, not the district court, to assess the validity of plaintiff's uncorroborated version of events." *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016) (quotations omitted). This is not one of the rare cases in which a plaintiff's testimony is so undermined by other evidence in the record that the Court can set it aside at the summary judgment stage. *Id.* at 10 ("Evidence satisfying this standard, such as a video tape that 'quite clearly' demonstrates the falsity of the plaintiff's statement, rarely exists."). Resolving the dispute about what happened would require the Court to weigh evidence and make credibility determinations—functions that it must not undertake at the summary judgment stage. *See Czekalski*, 475 F.3d at 363 (courts must "eschew making

---

[6] The case Defendants cite for the possibility that a mistake can be legitimate, nondiscriminatory reason, *Williams v. Staples, Inc.*, 372 F.3d 662 (4th Cir. 2004), does not actually so hold. There, the court assumed without deciding that the sales clerk's "mistake" about the store's check policy was a legitimate, nondiscriminatory reason for having refused to serve a black customer, *id.* at 668–69, before ultimately deciding that there was sufficient evidence to conclude that such a proffered reason was pretextual, *id.* at 669.

credibility determinations or weighing the evidence" at the summary judgment stage).  "Because

genuine issues of material fact exist on the § 1981 claim, summary judgment would be

inappropriate, particularly since liability would turn on the discriminatory intent of the

defendant."  *Mitchell*, 274 F. Supp. 2d at 47; *see also Banks*, 505 F. Supp. 2d at 168 (denying

summary judgment where "there [was] no support among the undisputed facts" to support

defendant's articulated nondiscriminatory reason).

### 2.  DCHRA (Count III)

The DCHRA makes it unlawful in the District of Columbia to "deny, directly or

indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, and accommodations of any place of public accommodations" either "wholly or

partially" on the basis of, *inter alia*, "race, color, [or] personal appearance."  D.C. Code § 2-

1402.31(a)(1).  "The legal standards applicable to race discrimination are the same under the

DCHRA and [Section] 1981."  *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86

(D.D.C. 2006) (quoting *Fox v. Giaccia*, 424 F. Supp. 2d 1, 6–7 (D.D.C. 2006)).  The Court's

reasoning with respect to racial discrimination under § 1981 accordingly applies to Mr. Jackson's

DCHRA claim, as well.

The DCHRA also prohibits a denial of services on the basis of personal appearance,

which the Court must address separately.  Personal appearance is defined for purposes of the

DCHRA as "the outward appearance of any person, irrespective of sex, with regard to bodily

condition or characteristics, manner or style of dress, and manner or style of personal grooming,

including, but not limited to, hair style and beards."  D.C. Code § 2-1401.02(22).  The DCHRA's

definition contains only a few limited exceptions, including "the requirement of cleanliness,

uniforms, or prescribed standards, when uniformly applied for admittance to a public

accommodation." *Id.*  Defendants do not argue that there was any uniformly applied prescribed standard of appearance for admission to Starbucks that Mr. Jackson failed to meet.  Rather, they argue only that there is not enough evidence from which a factfinder could reasonably infer that Mr. Jackson was discriminated against on this basis.  The Court disagrees.

There is ample testimonial and video evidence that Mr. Jackson was not well-dressed that day.  *See* Jackson Dep. Tr. 225:9–14 ("[A]t the time I had just got into my apartment and my clothes situation wasn't all that great at the time.  So, yes, I probably had on some jeans probably was too big for me and, you know, the shirt probably was wrinkled or whatever that be.  I wasn't dressed up to my best potential."); Ward Dep. Tr. 225:1–5 ("Mr. Jackson has a look, like he's a drug user or that he abuses drugs.  He has that look.  I don't think he had any teeth in his mouth, and if he did, he didn't have the top ones."); Ex. 4 of Defs.' Opp'n at 12:08:34 (video footage showing Mr. Jackson's personal appearance on that day).  A jury could credit any of that evidence despite the fact that Mr. Jackson does not specifically recall what he was wearing that day.  *See* Defs.' Reply at 4 (pointing to testimony that "Mr. Jackson has no recollection of the clothing that he was wearing on April 24, 2018").

For the same reasons it would be reasonable for a jury to infer that Mr. Jackson's race played a role in the accusation that he stealing and the subsequent demand that he leave the store, it would be reasonable for a jury to infer that Mr. Jackson's personal appearance, dressed in a manner that some might interpret as indigent, also played a role in the actions of the Starbucks employees that day.  Discrimination on the basis of race and discrimination on the basis of personal appearance are not mutually exclusive, and in some instances may in fact reinforce each other.  *See McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 957 (D.C. 2000) (acknowledging the cognizability of an argument that "because of [a plaintiff's] choice of

clothing and hairstyle, she represents a subset of African–Americans whose claim of discrimination based on race, coupled with personal appearance, cannot be defeated by hiring to replace her an African–American whose dress more typically reflects corporate America").

Once again, weighing the credibility of the evidence and drawing inferences about discriminatory intent are the province of the jury. *Mitchell*, 274 F. Supp. 2d at 47. A jury may or may not credit this evidence or draw an inference that Mr. Jackson was discriminated against on the basis of his personal appearance, but Mr. Jackson is entitled to present his evidence on the DCHRA claim to a jury and allow them to reach that ultimate conclusion.

### D.  Tort Claims

In addition, Mr. Jackson asserts claims for general negligence, negligent supervision, and battery against both Starbucks and Mr. White-Hunt, seeking to hold both vicariously liable for Mr. Washington's actions in shoving and ultimately injuring Mr. Jackson. The Court will grant summary judgment to Starbucks on the issue of vicarious liability for Mr. Washington's alleged negligence, but it will allow the negligent supervision claim to proceed against Mr. White-Hunt and against Starbucks under a theory of vicarious liability.

#### 1.  Negligence and Negligent Supervision (Count I)

At the outset, the Court finds it useful to clarify exactly what theories of negligence Mr. Jackson asserts and against whom. *See* Am. Compl. ¶¶ 64–70 (discussing both vicarious liability for negligence and negligent supervision under Count I). Count I of the Amended Complaint alleges that Mr. Washington's actions meet the standard for negligence, *see id.* ¶ 66, and that Mr. White-Hunt's actions meet the standard for negligent supervision, *id.* ¶¶ 67–68. It then alleges that "Starbucks is vicariously liable for Washington's and White-Hunt's actions." *Id.* ¶ 69. Put another way, the Court understands Count I to encompass three related negligence claims: 1) that

Starbucks is vicariously liable for the negligence of Mr. Washington (who is not a party to this action), 2) that Mr. White-Hunt is liable for negligent supervision, and 3) that Starbucks is vicariously liable for Mr. White-Hunt's negligent supervision.

"In a traditional negligence action, a plaintiff must prove the existence of a duty of care owed by the defendant to him . . . a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 575 (D.C. 2007). In contrast, "[t]he cause of action for negligent supervision, derived from this standard negligence tort, recognizes that an employer owes specific duties to third persons based on the conduct of its employees." *Id.* "[A] common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law." *Id.* at 576. An employer is generally liable for an employee's tortious conduct only if the employee was acting "within the scope of their employment." *Boykin v. District of Columbia*, 484 A.2d 560, 561 (D.C. 1984).

### a.  Mutual Exclusivity of Battery and Negligence Claims

Defendants first argue that Mr. Jackson's general negligence claim is duplicative of its battery claim, as both are premised on Mr. Washington's intentional action of shoving Mr. Jackson. Defs.' Mot. at 9. Under D.C. law, "both negligence and battery claims, in order to go to the jury, must be separate and distinct from each other." *District of Columbia v. Chinn*, 839 A.2d 701, 707 (D.C. 2003). The case Defendants cite, *Chinn*, does not rigidly prohibit a plaintiff from bringing both negligence and intentional tort claims in the same action; rather, it instructs the court to "look to the particular facts and circumstances of the case to properly characterize the action" and not allow plaintiffs to "bootstrap from the battery proof alone" without separately establishing the elements of negligence. *Id.* at 710. In *Chinn*, a plaintiff alleged only an

intentional use of excessive force by arresting officers, but without any separate allegations that would support a negligence theory, such as if "the officers mistakenly or negligently thought Chinn was armed" or "the officers misperceived him as a threat."  *Id.* at 711; *see also Rice v. District of Columbia*, 774 F. Supp. 2d 25, 32 (D.D.C. 2011) (allowing a negligence claim to proceed as an alternative theory to the excessive force claim where the pleadings alleged negligent handling and discharge of a weapon).

With respect to the negligent supervision claim against Mr. White-Hunt, it is clear that the basis of this claim is predicated on facts apart from Mr. Washington's actions; principally, Mr. White-Hunt's failure to intervene or prevent Mr. Washington's actions.  The court in *Spicer v. District of Columbia* allowed a claim for negligent supervision to proceed against a supervising officer who was allegedly "negligent in failing to adequately supervise the other officers" who then intentionally attacked an inmate, but granted judgment on the pleadings with respect to the negligence claim against the officers who allegedly committed the intentional battery.  *Spicer v. District of Columbia*, 916 F. Supp. 2d 1, 3 (D.D.C. 2013).  This case has a similar structure.  The negligent supervision claim against Mr. White-Hunt, and Starbucks's vicarious liability for that negligent supervision, are theoretically separate from the underlying physical altercation between Mr. Washington and Mr. Jackson, and *Chinn* does not preclude Mr. Jackson from pursuing them as a matter of law.

Starbucks's liability for Mr. Washington's actions presents a more difficult question. There is some evidence from which a jury could find that Mr. Washington acted negligently rather than intentionally in pushing Mr. Jackson.  *See* Ward Dep. Tr. at 32:20–33:16 ("I believe [Mr. Washington was] trying to usher the man out . . . I believe the man may have hit [Mr. Washington]" but "[Mr. Washington]'s body stance was so solid that it caused the man to fall.");

*id.* at 34:15–16 ("[Mr. Washington] was a gentle giant.  He was like a Teddy Bear.").  A reasonable jury could choose to credit this testimony and determine that Mr. Washington was negligent, as opposed to intentional, and thus that Starbucks could be vicariously liable for negligence rather than battery.

The problem is that this is not what Mr. Jackson has pleaded.  The Amended Complaint alleges that Mr. Washington "failed to exercise reasonable care by coming out from behind the counter, stalking towards Mr. Jackson in a threatening manner, escalating the situation through physical proximity and threatening demeanor, and twice pushing Mr. Jackson."  Am. Compl. ¶ 66.  But the listed actions are intentional and materially indistinguishable from the battery claim, and "[a] plaintiff cannot distinguish his two claims merely by adding words like 'standard of care. . . .'"  *Elshazli v. District of Columbia*, 415 F. Supp. 3d 20, 27 (D.D.C. 2019).  In fact, Mr. Jackson has consistently maintained throughout his pleadings and briefing that Mr. Washington's actions were intentional.  *See, e.g.*, Pl.'s Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Opp'n") at 27, ECF No. 50.

Although *Chinn* does not explicitly foreclose the possibility of pleading battery and negligence as alternative theories of recovery, "the weight of the caselaw" suggests that both this district and the D.C. courts have routinely applied *Chinn* at the motion to dismiss and summary judgment stages.  *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 916 (D.C. Cir. 2015) (affirming a grant of summary judgment on a negligent infliction of emotional distress claim that did not "distinguish between negligent and intentional acts" as required by *Chinn*); *Elshazli*, 415 F. Supp. 3d at 28 (collecting cases applying *Chinn* at the motion to dismiss stage); *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 46 (D.D.C. 2015) (same); *see also Blair v. District of Columbia*, 190 A.3d 212, 223–24 (D.C. 2018) (acknowledging that dual instructions may be

appropriate where "the evidence . . . might be interpreted to tell two, fundamentally different stories" but affirming a grant of summary judgment because the "allegations [did] not rely on a factual scenario different from" the alleged assault and the plaintiff "claim[ed] no injury traceable to [the defendant]'s 'negligent' actions that were 'separate and distinct' from [the] assaultive conduct"). Mr. Jackson chose to pursue an intentional tort claim of battery on these facts that, as alleged, is inconsistent with negligence. He cannot belatedly rely on otherwise unfavorable testimony to salvage negligence as an alternative theory of recovery.[7] Accordingly, the Court will grant summary judgment to Starbucks on the issue of its vicarious liability for Mr. Washington's negligence.[8]

### b. Liability of Mr. White-Hunt for Negligent Supervision

The tort of negligent supervision "allows a plaintiff to hold employers directly liable for their failure to properly supervise their personnel." *James v. District of Columbia*, 869 F. Supp. 2d 119, 121 (D.D.C. 2012); *Griffin*, 925 A.2d at 575. "[A]n action for negligent supervision . . . requires proof that the employer breached a duty to plaintiff to use reasonable care in the supervision . . . of an employee which proximately caused harm to plaintiff." *Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002). "This requires that the plaintiff show '(1) that

---

[7] Moreover, the Court considers this portion of the testimony from Ms. Ward, who admitted that she "really [doesn't] know how [the altercation] happened," *see* Pl.'s Fact Resp. ¶ 19 (quoting Ward Dep. Tr. at 38:7–10), to be too speculative and otherwise uncorroborated to preclude summary judgment, *see Anderson*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)).

[8] The Court does not understand Mr. Jackson to be raising a claim that Mr. White-Hunt is also vicariously liable for Mr. Washington's negligence rather than for his own negligent supervision, but to the extent he is, that claim is foreclosed by the same reasoning. The Court also need not reach Defendant's argument about the standard of care as it relates to Mr. Washington's actions or whether Mr. Washington breached that standard of care. *See* Defs.' Mot. at 10.

Defendants knew or should have known its employees behaved in a dangerous or otherwise incompetent manner, and (2) that Defendants, armed with that actual or constructive knowledge, failed to adequately supervise its employees.'" *Jackson v. Starbucks Corp.*, 2021 WL 1317883, at *3 (quoting *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 79 (D.D.C. 2005) (cleaned up)).

As it was at the motion to dismiss stage, Mr. White-Hunt's primary argument is that he could not have foreseen Mr. Washington's actions, and thus lacked any actual or constructive knowledge that Mr. Washington would behave in a dangerous manner. *Id.* at *4. Now at the summary judgment stage, the Court finds that there is evidence from which a reasonable factfinder could find that those elements have been met. Mr. White-Hunt himself testified that a manager would "ideally" be the best person to confront a disruptive customer, but that a subordinate could do so "if they feel comfortable." White-Hunt Dep. Tr. 152:14–153:11. Another employee testified that Mr. White-Hunt "avoided confrontation" and would "ignore or not handle conflict situations." Ward Dep. Tr. 40:4–17. The video footage shows when Mr. Washington approached Mr. Jackson, Mr. White-Hunt was close behind. Ex. 5 of Defs.' Mot. at 12:12:46–56. Moreover, Mr. Jackson testified that he was pushed by Mr. Washington not once but twice, and that Mr. White-Hunt failed to intervene even after the first push. Jackson Dep. Tr. 246:6–14.

At minimum, this evidence is enough for a reasonable factfinder to conclude that Mr. White-Hunt had actual knowledge as the conflict occurred that Mr. Washington was behaving in a dangerous or otherwise incompetent manner and failed to intervene. As this Court pointed out in its prior opinion, there are at least a few cases in the District of Columbia that have allowed a negligent supervision claim to proceed solely on evidence of a supervisors' "contemporaneous notice of a subordinate's dangerous or incompetent action." *Jackson v. Starbucks Corp.*, 2021

WL 1317883, at *5 (discussing *Spicer*, 916 F. Supp. 2d at 3 and *Godfrey v. Iverson*, 559 F.3d 569, 571 (D.C. Cir. 2009)).

Defendants are correct that Mr. Jackson also has the burden of proving the relevant standard of care for the negligent supervision claim, and that the D.C. Court of Appeals has trended toward requiring expert testimony in an increasingly wide number of situations, and "even in those that might initially seem to fall within jurors' common knowledge." *See Godfrey*, 559 F.3d at 572. Still, Mr. Jackson contends that no expert testimony is required here, Pl.'s Opp'n at 28, and the Court agrees.

*Godfrey v. Iverson* is directly on point. In that case, a nightclub patron sought to hold a celebrity defendant liable for negligent supervision as a result of physical injuries inflicted by the defendant's personal bodyguard—in the defendant's presence. *Godfrey*, 559 F.3d at 571. In rejecting the argument that security issues usually require expert testimony on the standard of care, the D.C. Circuit explained,

> The key distinction . . . is that here the individual with the supervisory authority (Iverson) was *present* when his employee (his personal bodyguard Kane) committed the tortious acts. It was this fact, together with the duration of the melee, that led the district court to believe that the jury could find that Iverson had the ability to supervise or control Kane's behavior that night, a mandatory element of the negligent supervision tort. Iverson's presence during the attack also affects the standard of care. A jury may need the aid of expert testimony to evaluate how a hotel should train and otherwise supervise its security guards to ensure that they do not unreasonably use force *on some future date*. But it is a different thing altogether to say such expert assistance is needed to establish the standard of care for an individual who is present while his personal bodyguard, acting on his behalf in clearing a room in a nightclub, beats a customer and causes significant injuries.

*Id.* at 573 (emphasis in original). Contrary to Defendants' argument, it is entirely irrelevant whether or not "it was Mr. White-Hunt's duty to provide security at the store." *See* Defs.' Mot. at 15. Surely Mr. Iverson did not have a duty to provide security at the nightclub, either, but the court found that he had a common-sense duty not to stand by while his employee committed an

intentional tort.  Here, too, it does not require expert testimony for a jury to conclude that Mr.

White-Hunt had a duty to not stand by while an employee under his direct supervision physically

attacked a customer.

In a related and final attempt to avoid liability for negligent supervision, Mr. White-Hunt

attempts to argue that he was not, in fact, Mr. Washington's employer.  Defs.' Mot. at 11–12.

Specifically, he claims that because "Mr. Washington was employed as a barista" and not to

"protect partners from disruptive customers," that "the relationship between Mr. White-Hunt and

Mr. Washington lacked the hallmarks of an employer-employee relationship."  *Id.* at 12.  This

reasoning appears to conflate the issue of whether Mr. Washington was acting within the scope

of his employment with negligent supervision, which is a distinct theory of liability.  *See Brown

v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001) ("[Defendant's] duty to supervise is not

merely to be judged by the concept of respondeat superior." (quotations omitted)).  In *Brown v.

Argenbright*, the D.C. Court of Appeals affirmed a grant of summary judgment on the issue of

negligent supervision where "[t]he only evidence arguably supporting the theory that [the store]

was negligent in supervising [the alleged tortfeasor] was that [another] employee may have been

present at the time of the alleged assault" but "there was no evidence indicating that [the other]

employee had either the power to control [the alleged tortfeasor]'s conduct or the opportunity to

alert someone who did have that power in time to prevent the harm."  *Id.*  Similarly, the

Restatement of Agency makes clear that a principal may be liable for harm resulting from an

agent's conduct if the principal was "negligent or reckless . . . in permitting, or failing to prevent,

negligent or other tortious conduct by persons, whether or not his servants or agents, upon

premises or with instrumentalities under his control."  Restatement (Second) of Agency § 213

(1958).

The question is therefore whether Mr. White-Hunt had the authority and opportunity to prevent Mr. Washington's conduct.  It is undisputed that Mr. White-Hunt was the store manager.  *See* Defs.' SUMF ¶ 19; White-Hunt Dep. Tr. at 30:12–15 ("What are your job responsibilities as a store manager? A To oversee the day-to-day runnings of the business.").  A reasonable jury could infer from that position that Mr. White-Hunt had the authority to intervene and stop Mr. Washington's actions.  In fact, Mr. White-Hunt's testimony—although disputed—suggests that he tried to do so.  White-Hunt Dep. Tr. at 279:12–16 (stating that he "tried to get in the way" to "remove" Mr. Washington from the situation).  Accordingly, the negligent supervision claim against Mr. White-Hunt may proceed.

### c. *Vicarious Liability of Starbucks for Mr. White-Hunt's Negligent Supervision*

The only remaining negligence question, then, is whether Starbucks may be held vicariously liable for Mr. White-Hunt's alleged negligent supervision.  The briefing is lamentably unclear on this issue, instead focusing on the issue of vicarious liability for Mr. Washington's negligence, which the Court need not consider.  *See* Pl.'s Opp'n at 24–25; Defs.' Reply at 14.  Nor does either party cite a case in which a company has been held vicariously liable for a mid-level manager's negligent supervision of an employee.  As with vicarious liability for any type of negligence, however, "an employer may be held liable for the acts of his employees committed within the scope of their employment."  *Boykin*, 484 A.2d at 561.  An employer is subject to liability when employees negligently discharge responsibilities within the scope of their employment, Restatement (Second) of Agency § 243 (1958), and the Court has not located any authority suggesting that the general principle would be any less applicable where the relevant responsibility is supervision of another.

There is enough evidence in the record from which a jury could determine that Mr. White-Hunt was acting within the scope of his employment when he was negligent in the supervision of Mr. Washington.  Again, Mr. White-Hunt was Mr. Washington's supervisor and had primary responsibility for the store.  *See* Defs.' SUMF ¶ 19.  Nor is there any suggestion that Mr. White-Hunt was acting out of any personal motivations during the incident; to the contrary, he claimed that he attempted to deescalate the situation "to maintain the safety of my partners and customers at the same time" and that he acted out of a "responsibility to jump in and take over."  White-Hunt Dep. Tr. at 280:17–22.  Mr. White-Hunt was also in charge of taking corrective action for employees who violated Starbucks policy, and in fact issued a final written warning to Mr. Washington for his actions in this incident.  Ex. E of Hudnall Decl., Ex. 1 of Defs.' Mot., ECF No. 46-3.  Thus, a reasonable jury could conclude that supervision of Mr. Washington was within the scope of Mr. White-Hunt's employment, and this claim may proceed.

## 2.  Battery (Count II)

Finally, Starbucks moves for summary judgment on Count II, which seeks to hold it vicariously liable for battery on the part of Mr. Washington.  Defs.' Mot. at 13–14.[9]  An employer may be liable for the torts of its employees if they were committed while the employee was "acting in the scope of their employment."  Restatement 2d of Agency § 219(a).  "[I]f the employee acts in part to serve his employer's interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge."  *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 (D.C. 2000).

---

[9] The Amended Complaint likewise sought to hold Mr. White-Hunt liable for aiding-and-abetting battery, but this Court dismissed that claim as untimely in its prior decision.  *Jackson v. Starbucks Corp.*, 2021 WL 1317883, at *7.

Although "generally an intentional tort is regarded as falling outside the scope of employment," the analysis of whether it is turns on the employee's motivations and how far outside the authorized activities it falls. *Kimbro v. Velten*, 30 F.3d 1501, 1505 (D.C. Cir. 1994). Starbucks naturally focuses on the requirement that intentional force be "not unexpectable," *id.* (quoting Restatement (Second) of Agency § 228(d) (1958)), but a violent action is not "unexpectable" merely because it is technically disapproved. Of course, most employers do not authorize intentional torts, so allowing a company to escape vicarious liability by arguing that any unauthorized act is "unexpected" would swallow the rule entirely. Instead, an employer may be liable even for an action that "was in excess of the authority conferred by the employer upon" them so long as it "was committed in the course of the discharge of his duties and in furtherance of the work of the employer's business." *Jamison v. Encarnacion*, 281 U.S. 635, 641 (1930). In a remarkably similar case, the D.C. Court of Appeals upheld the sufficiency of the evidence for a store's vicarious liability in a case where an employee struck a client, stating that "[i]t was reasonable for the jury to conclude that the man's actions were motivated by a desire to require [the plaintiff] to pay for . . . the property of his employer" and that he acted "to resolve a job-related dispute." *Hechinger*, 761 A.2d at 25.

Here, there is evidence from which a reasonable jury could conclude that Mr. Washington was attempting to serve Starbucks's interests when he pushed Mr. Jackson, even if he exceeded the scope of his authority in doing so. *See, e.g.*, Ward Dep. Tr. at 176:1–2 (describing how Mr. Jackson was "holding up the line while all this is going on"); *id.* at 177:3–5 (describing Mr. Washington as saying "like, sir, come on, you need to leave the store. You need to exit now. You can't keep disrespecting the staff."); White-Hunt Dep. Tr. at 153:1, 18–19

(testifying that if a Starbucks employee feels comfortable, they should physically confront a verbally disruptive customer, and that any employee could do so because "we're all one team").

Defendants' alternative characterizations for Mr. Washington's motivations are nothing more than yet another disputed issue of fact. *See* Defs.' Mot. at 14 (suggesting that Mr. Washington may have acted in "self defense"); Defs.' Reply at 9 (suggesting, based on Mr. Jackson's recollection, that Mr. Washington was motivated by "chivalry" to protect Ms. Robinson).  "[W]hether an employee is acting within the scope of his employment is a question of fact for the jury." *Brown*, 782 A.2d at 757.  Accordingly, the Court reiterates, once again, that it will be up to the jury to resolve the competing characterizations of the events in this case, and it denies summary judgment on the issue of Starbucks's liability for battery.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 46) is **GRANTED IN PART AND DENIED IN PART**, Defendant Starbucks's Motion for Leave to File Under Seal Certain Exhibits (ECF No. 48) is **GRANTED IN PART AND DENIED IN PART**, and Plaintiff's Motion for Leave to File a Surreply (ECF No. 55) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 25, 2022                              RUDOLPH CONTRERAS
                                                    United States District Judge